OFFICE U.S. DISTRICT. COURT
AT LYNCHBURG, VA
FILED

AUG 14 2026

LAURA A. AUSTIN, CLERK
BY: [signature]
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF VIRGINIA

## LYNCHBURG DIVISION

**MARY K. WELSH**

Plaintiff,

v.

**LIBERTY UNIVERSITY, INC., JONATHAN FALWELL, DONDI E. COSTIN, JASON WRIGHT, APRIL R. CRABLE, ERIC CAMDEN, and STEPHEN J. VAUGHAN**

Defendants.

**Civil Action No.** 6:26CV00098

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Mary K. Welsh ("Plaintiff" or "Ms. Welsh"), by and through her undersigned counsel, as and for her Complaint against Defendants Liberty University, Inc. ("Liberty University" or "Liberty"), Rev. Jonathan Falwell ("Falwell"), Dondi E. Costin ("Costin"), Dr. Jason Wright ("Wright"), Dr. April R. Crable ("Crable"), Dr. Eric Camden ("Camden"), and Stephen J. Vaughan ("Vaughan") (collectively, "Defendants"), alleges upon knowledge with respect to herself, and upon knowledge, information and belief as to all other matters, as follows:

## THE NATURE OF THIS ACTION

This case arises out of discrimination, retaliation, and denial of contracted educational benefits in violation of Plaintiff's rights under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. Section 1681 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Section 794; the Americans with Disabilities Act, 42 U.S.C. Section 12181 et seq.; and Virginia common law of contract.

Plaintiff is a graduate student who was enrolled solely in Liberty University's CACREP-accredited Clinical Mental Health Counseling M.A. program. She is not, and has never been, an employee, contractor, or volunteer of Liberty University.

During Plaintiff's clinical internship placement at Project Turnabout, an off-site fieldwork location approved by Liberty, Plaintiff reported unsafe site conditions to Defendant Dr. April R. Crable, Liberty's Director of Clinical Training. Approximately three months earlier, on May 14-15, 2024, Plaintiff had reported inappropriate sexualized conduct by Defendant Dr. Jason Wright - her Liberty faculty group supervisor in the course designated COUC 693 - to Liberty's advising staff, whose contemporaneous notes were later produced by Liberty's Registrar's Office in the 563-record account phone log.

Within weeks of these protected disclosures, Defendant Wright, acting in concert with the Department of Counselor Education and Family Studies Remediation Committee, initiated an academic-misconduct proceeding against Plaintiff, and Liberty placed an administrative remediation hold on Plaintiff's student account with a system default end-date of December 31, 2099. No advance notice, no written remediation plan, no meeting, and no appeal rights preceded that action.

Liberty then denied Plaintiff reasonable accommodations that Plaintiff had documented as arising from a bereavement crisis and from HIPAA-related site barriers, contrary to Liberty's own written extension standard.

Plaintiff completed the academic requirements of her degree program. Liberty's Registrar's Office confirmed the earned credit hours on Plaintiff's official transcript. Plaintiff paid the tuition, and Liberty issued a receipt. Liberty then refused to confer the degree at the direction of the very department Plaintiff had reported.

Liberty then employed a Non-Disclosure Agreement framework to condition Plaintiff's access to the Title IX evidence file on Plaintiff's signature relinquishing the right to communicate about that evidence with external oversight bodies. Plaintiff was denied unconditional access to the directly-related evidence, was denied unconditional access to the Investigative Report, was denied meaningful participation in the live hearing, and was denied a written notice of determination within the timeframe Liberty's own policy required.

When Liberty finally issued a Notice of Determination on July 17, 2026 - more than twenty-six months after the operative protected activity of May 2024 - the Determination reaffirmed the same NDA framework as a condition of appeal-file access, reaffirmed the ban on unauthorized redistribution as a form of retaliation, and issued a "not responsible" finding as to the Respondent that on its face contradicted Liberty's own contemporaneous records.

Throughout the operative period, Liberty invoked the Family Educational Rights and Privacy Act ("FERPA") to shield institutional policy and procedural questions from state and federal oversight, while separately disclosing Plaintiff's protected student-account status to a third-party employer - Western Mental Health Center, which had employed Plaintiff during her clinical internship placement and was her prospective post-program employer - resulting in the termination of Plaintiff's employment days later.

Plaintiff therefore brings this action for relief based on causes of action for violations of Title IX, Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and Virginia common law of contract.

## THE PARTIES

At all relevant times, Plaintiff was a graduate student enrolled in Liberty University's CACREP-accredited Clinical Mental Health Counseling Master of Arts program. Plaintiff is currently a resident of Springfield, Minnesota.

Defendant Liberty University, Inc. is a Virginia corporation that operates as a private evangelical Christian university and is located in Lynchburg, Virginia.

Liberty University receives federal financial assistance and is therefore subject to Title IX and Section 504 of the Rehabilitation Act.

Upon information and belief, Defendant Rev. Jonathan Falwell ("Falwell") is, and at all relevant times was, a resident of the Commonwealth of Virginia and the Chancellor of Liberty University.

Upon information and belief, Defendant Dondi E. Costin ("Costin") is, and at all relevant times was, a resident of the Commonwealth of Virginia and the President of Liberty University.

Upon information and belief, Defendant Dr. Jason Wright ("Wright") is, and at all relevant times was, a resident of the Commonwealth of Virginia and a faculty member in Liberty's Department of Counselor Education and Family Studies, serving as the faculty group supervisor in the course designated COUC 693 in which Plaintiff was enrolled.

Upon information and belief, Defendant Dr. April R. Crable ("Crable") is, and at all relevant times was, a resident of the Commonwealth of Virginia and the Director of Clinical Training for Liberty's Clinical Mental Health Counseling program.

17A. Upon information and belief, Defendant Dr. Eric Camden ("Camden") is, and at all relevant times was, a resident of the Commonwealth of Virginia and served as a Co-Director of Liberty's Clinical Mental Health Counseling program in the Department of Counselor Education and Family Studies. Camden was one of the two program decision-makers who convened and conducted the March 7, 2025 Remediation Meeting referenced at paragraph 115 below, and was a program-level decision-maker in the sequence of adverse actions leading to the June 17, 2025 program-dismissal email referenced at paragraph 123 below.

18. Upon information and belief, Defendant Stephen J. Vaughan ("Vaughan") is, and at all relevant times was, a resident of the Commonwealth of Virginia and served as the Title IX Hearing Officer who signed and transmitted the July 17, 2026 Notice of Determination in Case No. 2024046901.

## JURISDICTION AND VENUE

This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. Sections 1331 and 1367 because (i) the federal law claims arise under the Constitution and statutes of the United States, and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

This Court has personal jurisdiction over Defendant Liberty University on the grounds that it conducts business within the Commonwealth of Virginia.

Venue for this action properly lies in this district pursuant to 28 U.S.C. Section 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims

occurred in this district.

## FACTS

### I. Plaintiff's Background and Enrollment at Liberty University

Plaintiff enrolled in Liberty University's Clinical Mental Health Counseling Master of Arts program in the Department of Counselor Education and Family Studies within Liberty's School of Behavioral Sciences. The program is accredited by the Council for Accreditation of Counseling and Related Educational Programs ("CACREP").

To earn the degree, Plaintiff was required to complete coursework in counseling theory, ethics, assessment, group counseling, and other subject areas, and to complete a 100-hour supervised practicum followed by a supervised internship of at least 600 clinical hours at an off-site fieldwork location approved by Liberty.

Liberty's Off-Site Fieldwork Contract governs the terms of the clinical placement between the student, Liberty, and the approved off-site supervisor(s). The contract identifies the site, the assigned supervisor(s), the placement start and end dates, and the responsibilities of each party.

On February 21, 2024, Plaintiff executed the Off-Site Fieldwork Contract for her 600-hour clinical placement at Project Turnabout, a substance-use treatment facility. The Supervisor's Name field of the contract identified both Joss Pullan and Laura Runia as Plaintiff's co-supervisors at the site from the outset of the placement.

From the beginning of the placement, Laura Lee Runia, LPCC/BBHT, served as a Board-Approved Clinical Supervisor at Project Turnabout and personally supervised Plaintiff throughout the placement. Ms. Runia completed midterm and final evaluations

of Plaintiff's clinical work and verified and signed off on Plaintiff's clinical hours.

Liberty's Registrar's Office recorded and confirmed the credit hours associated with Plaintiff's practicum and internship placements as they were earned. The credit hours appear on Plaintiff's official Liberty academic transcript. Plaintiff paid the tuition and fees associated with these credit hours, and Liberty accepted the payment and issued a receipt.

## A. July 2024: Plaintiff Reports Unsafe Site Conditions to Her Program Director

Plaintiff's Liberty academic transcript, produced from Liberty's own Banner student-information system, documents that Plaintiff maintained a cumulative graduate grade-point average of 3.70 across the fifty-one graded quality hours she completed in the Master of Arts program, and that Plaintiff was in "Good Standing" every term from Summer 2020 through Spring 2024. The transcript records multiple "A" grades across the counseling core, including COUC 501 Ethical and Legal Issues in Counseling, COUC 500 Orientation to Counseling Profession Identification and Function, COUC 502 Human Growth and Development, COUC 505 Counseling Techniques and Helping Relationships, COUC 506 Integration of Spirituality and Counseling, COUC 512 Group Counseling, COUC 522 Career Development and Counseling, COUC 546 Psychopathology, COUC 601 Theories of Family Systems, COUC 604 Crisis Counseling, COUC 691 Substance Abuse: Diagnosis / Treatment / Prevention, and LIFC 602 Marriage Coaching, together with an "A" in undergraduate PSYC 354 Statistics for Social Sciences. In the Spring 2024 term immediately preceding the operative Summer 2024 term, Plaintiff completed COUC 692 Counseling Practicum with a passing grade. The only non-passing marks on Plaintiff's transcript appear in the Summer 2024 term itself - a "W" (withdrawal) in COUC 504 and an "NP" (non-pass) in COUC 693 Counseling Internship I - in the very course and term in which the retaliatory conduct

described in Sections A through D below manifested. The transcript is therefore both Liberty's own contemporaneous confirmation of Plaintiff's academic excellence prior to the operative period, and Liberty's own record of the abrupt discontinuity that coincides with Plaintiff's protected activity. The "A" grade in COUC 501 Ethical and Legal Issues in Counseling separately contradicts the ethics-adjacent framing of the August 12, 2024 Academic Misconduct Notice described in Section D below.

Beginning in the spring of 2024, Plaintiff learned of a pattern of unsafe conditions at Project Turnabout, including reports of drug activity on the premises, a near-fatal client medication error occurring without appropriate clinical supervision, missing supervision, and sexualized comments by a site supervisor.

On July 21, 2024, Project Turnabout staff member Marti Paulson (telephone number 320-894-5064) sent Plaintiff a text message identifying herself by name and expressly warning Plaintiff not to enter the site: "Mary, this is Marti Paulson calling I need for you to know that you should not come in on Sunday. I repeat you do not come in on Sunday. You will meet with TD and myself on Monday morning." The text message is Plaintiff's first documented notice from Project Turnabout staff that Plaintiff should not physically enter the site. The identified sender - Ms. Paulson, whom Liberty had approved through Project Turnabout as part of the placement - directed a directive-not-to-enter rather than a routine schedule change, and paired it with a directive to meet with the site director (Theodore Hostikka) and Ms. Paulson herself on the following Monday.

On July 23, 2024, Plaintiff reported the unsafe site conditions to Dr. April R. Crable, Ph.D., Liberty's Director of Clinical Training. Plaintiff informed Dr. Crable that she did not feel safe at Project Turnabout due to alleged drug activity on the premises and due to a client who had nearly died from an incorrect medication dose without

appropriate clinical supervision.

That same day, Dr. Crable acknowledged Plaintiff's report in a written email. The email is Liberty's own contemporaneous written acknowledgment that Plaintiff had made a protected disclosure of safety concerns at an approved off-site placement.

On July 25, 2024, at 4:13 p.m., Plaintiff emailed Project Turnabout site director Theodore Hostikka and site supervisor Niels Kleppegge (with Dr. Crable copied) summarizing the on-site meeting at which Plaintiff had requested that Jose (Joss) Pullan be dropped as her supervisor because Mr. Pullan had not signed off on Plaintiff's clinical hours for the semester and had not completed her midterm evaluation, and confirming that Laura Lee Runia had been supervising Plaintiff since January 2024 (from the beginning of the placement). In the same email Plaintiff returned her Project Turnabout badge and keys and identified the day as her last day on-site notwithstanding that the internship formally continued through the end of August 2024. Later that evening Plaintiff emailed Dr. Crable separately (July 25, 2024 at 11:40 p.m.), citing "the significant on-going actions of this facility" and "safety issues for my family," and forwarded the underlying materials to Ms. Runia.

On July 26, 2024, at 11:57 a.m., Plaintiff emailed Dr. Crable proposing an accommodation that would preserve Plaintiff's ability to complete the internship without returning to the physically dangerous site: Plaintiff proposed remaining "connected to this site until the end of the semester," continuing remote clinical supervision with Ms. Runia (with whom Plaintiff had spent "two and half hrs. on the phone" the prior night), and having Ms. Runia complete Plaintiff's final evaluation and sign off on Plaintiff's clinical hours. On July 26, 2024, at 12:35 p.m., Plaintiff separately confirmed to Dr. Crable that Plaintiff would meet weekly with Ms. Runia (in person or by phone) as a mandatory reporter and would turn over all clinical notes at the end of the semester.

On July 26, 2024, at 12:15 p.m., Dr. Crable responded in writing: "If you remain at the site, you will need to be working at the site. This is a requirement of the program. Because you reported that it is not safe, you cannot return there. I have a meeting scheduled with the clinical director on Monday. The team will review your concerns and will make recommendations for next steps." Dr. Crable's July 26, 2024 email is Liberty's own contemporaneous written statement of a categorical requirement - that Plaintiff must be working at the site to complete the internship - imposed upon Plaintiff at the same moment Liberty had accepted Plaintiff's report that the site was unsafe. Dr. Crable's follow-up email later the same day at 7:58 p.m. - "I am not sure I understand this. I thought you were no longer seeing clients because you felt unsafe at the site. What are you reporting on to Laura Lee?" - documents Dr. Crable's rejection of Plaintiff's proposed remote-supervision accommodation. Liberty did not offer, in the July 26, 2024 exchange or thereafter, a transfer of the placement to a safe site, a temporary suspension of the site-attendance requirement pending resolution of the safety concerns, a formal remote-supervision arrangement with Ms. Runia, or a referral to Liberty's disability-services or accommodation office. The July 26, 2024 email exchange is Liberty's own contemporaneous written record of a failure to provide reasonable accommodations under Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and Liberty's own Nondiscrimination and Equal Opportunity Policy, occurring before the August 8, 2024 bereavement crisis described in Section C below and constituting an independent failure to accommodate the safety-related concerns Liberty had itself acknowledged on July 23, 2024.

In August 2024, Plaintiff met with Project Turnabout leadership at the site. The site director, Theodore Hostikka, in a recorded meeting, acknowledged that Laura Lee Runia "was approved to be your supervisor on two separate occasions by me" and that Mr. Hostikka had "emailed your school" to notify Liberty of Ms. Runia's supervisory

role.

Plaintiff enumerated approximately 32 distinct concerns about the site to Mr. Hostikka during that meeting, including drug activity, the near-fatal medication event, missing supervision, sexualized comments by a site supervisor, and the ongoing harm to Plaintiff's career and finances.

Public reviews of Project Turnabout on Glassdoor (2018-2024) and on Google separately documented a pattern of toxic leadership, safety violations, HIPAA violations, high turnover, near-fatal medication errors, and neglect that pre-dated Plaintiff's placement and that provided public notice of the site conditions Plaintiff later reported.

Under Title IX and the Rehabilitation Act, Liberty was required to respond promptly and reasonably to Plaintiff's reports of unsafe placement conditions, including by evaluating the safety of the placement, offering supportive measures to Plaintiff, and, if appropriate, transferring Plaintiff to a safe placement.

Liberty did not evaluate the safety of the Project Turnabout placement. Liberty did not offer Plaintiff supportive measures. Liberty did not transfer Plaintiff to a safe placement.

Instead, within weeks of Plaintiff's July 23, 2024 report to Dr. Crable, Liberty escalated adverse actions against Plaintiff, culminating in an academic-misconduct charge and an administrative remediation hold, both described in Sections C and D below.

In April 2026, Plaintiff supplemented her Office for Civil Rights ("OCR") complaint (Case OCREMAIL00766493G) with the site-safety record and the six documented themes of the retaliation timeline, so that the federal record would reflect Liberty's non-response to the safety disclosure.

**B. May-July 2024: Plaintiff Reports Sexualized Conduct by Her Faculty Group Supervisor**

During Plaintiff's enrollment in the COUC 693 course, Defendant Wright served as her faculty group supervisor. The course included weekly online group-supervision sessions with Wright and other students.

In the course of the group-supervision sessions, Wright made a series of sexualized comments and proposals during class discussion, including proposing after-hours one-on-one meetings with Plaintiff on a recurring basis. The recorded classroom sessions capture Wright, on tape, proposing "if we could keep meeting on Tuesday nights, just me and you," and stating "throw in some Michael, yeah, Amy," "why don't you just bring everyone?", "every night of the week," and "Maybe a Saturday now."

During the same COUC 693 term, Wright also directed the class to delete session recordings from Liberty's Kaltura video-hosting system. On tape, Wright stated, "let's do it here in class ... I can delete mine that I put in, but I can't delete yours," and he then read down the class roster to confirm each student's deletion. This directed class-wide deletion protocol later explained the absence of session records that Liberty's Title IX apparatus subsequently treated as favorable to Wright.

On May 14-15, 2024, Plaintiff reported Wright's inappropriate conduct to her Liberty advising staff. The reports are contemporaneously memorialized in the 563-record account phone log later produced by Liberty's Registrar's Office at Plaintiff's request.

The 563-record account phone log produced by Liberty's Registrar's Office in March 2025 contains the contemporaneous call-registration entries created by Liberty Advising staff at the time of Plaintiff's May 14-15, 2024 reports. Those entries are Liberty's own written records - created by Liberty personnel in the ordinary course of

Liberty's business - of the substance, date, and time of Plaintiff's reports of Defendant Wright's inappropriate sexualized conduct.

The same call-registration entries reflect that Liberty Advising staff, on the day immediately following Plaintiff's initial May 14, 2024 report, sent Plaintiff a complaint form. The next-day dispatch of a complaint form corroborates that Plaintiff's May 14, 2024 report was substantive enough, in the assessment of the Liberty staff who received it, to warrant initiation of Liberty's complaint-form process. The next-day complaint-form dispatch is independent Liberty-authored corroboration that the report occurred.

Notwithstanding the substance and formality of the intake, the same Liberty Advising call-registration entries also characterize Plaintiff's report using the pathologizing term "ranting." The "ranting" characterization is itself Liberty-authored evidence that (a) the report was made, (b) it was received by Liberty staff, (c) it was recorded contemporaneously, and (d) the Liberty staff who recorded it framed a graduate student's report of faculty sexual harassment as an emotional episode rather than as a compliance concern. The pathologizing characterization compounds the retaliation record because it establishes an intake culture in which reports of the type Plaintiff made were, at the point of intake, discounted rather than escalated. The Title IX intake staff transcriptions later prepared as part of the formal complaint process (including the recordings of intake meetings identified in the record) contain no dispute of the reporting-timeline dates Plaintiff recites, and record Deputy Title IX Intake Officer Trinity's own admissions that she did not dispute Plaintiff's Day-One reporting account.

In substance, Plaintiff's advising-staff reports on May 14-15, 2024 described that Wright had asked her out on a date, and that Wright had made repeated inappropriate comments during class. The May 14-15, 2024 phone-log records establish, in Liberty

Advising's own contemporaneous words, exactly the substantive protected activity that Liberty's later Notice of Determination would say did not occur.

On or about November 11, 2024, one of Plaintiff's Liberty advisors, acting as a mandated reporter under Liberty's Sexual Misconduct Policy, filed a report of Wright's conduct with the Office of Equal Rights and Title IX. The mandated-reporter filing corroborates Plaintiff's May 2024 reports.

On July 7, 2024 - shortly after Plaintiff's May 14-15 advising-staff reports of Wright's conduct - Wright submitted his own Site Supervisor CCS-R Evaluation for Plaintiff, a top-tier score of 100 out of 100 (the top rubric tier for "CCS-R Score of 92-115"). The Canvas gradebook entry showing this score is Liberty's own contemporaneous written evaluation of Plaintiff's clinical performance by the faculty group supervisor immediately after the protected disclosure.

On July 9, 2024, Wright emailed Plaintiff in the course of an unrelated missed-assignment thread and stated in his own words the applicable extension standard: "I can only offer extensions for highly exceptional and emergent situations." This is Wright's own written articulation of Liberty's extension standard, which Plaintiff would later invoke.

On July 4, 2024, Plaintiff's Project Turnabout site supervisor Laura Lee Runia, LPCC/BBHT, completed the internship midterm evaluation for Plaintiff. On August 11, 2024, Ms. Runia completed the internship final evaluation. Both evaluations rated Plaintiff at high performance levels and are Liberty's own contemporaneous documentation, from the site supervisor Liberty had approved, of Plaintiff's clinical competence during the same COUC 693 term.

On August 8, 2024, at 8:14 a.m., Plaintiff emailed Wright disclosing her sister's death, her hospice circumstances, HIPAA-related site barriers to submission of the final

clinical assignments, 680 hours of trauma exposure over the internship, and the fact that Plaintiff felt unsupported.

That August 8, 2024 email was received by Wright one day before Wright later told the Title IX Hearing Officer he first learned of Plaintiff's sister's death "around August 9th." Liberty's own contemporaneous email record therefore contradicts Wright's later sworn account.

Notwithstanding Wright's written extension standard of "highly exceptional and emergent situations" (paragraph 53), Wright did not extend the July 2024 assignment deadlines for Plaintiff, and Wright instead escalated to a Turnitin high-percentage-match inquiry, culminating in the August 12, 2024 Academic Misconduct Notice described in Section D below.

## C. August 2024: Denial of Reasonable Accommodations During Bereavement Crisis

At the time of Plaintiff's August 8, 2024 email to Wright, Plaintiff was known to Liberty to be experiencing a bereavement crisis (her sister's death), was known to Liberty to be operating under HIPAA barriers at the site that limited her ability to complete final assignments, and was known to Liberty to be carrying a 680-hour trauma-exposure caseload at a site that Plaintiff had already reported to Dr. Crable as unsafe.

Under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act, and under Liberty's own Nondiscrimination and Equal Opportunity Policy, Plaintiff was entitled to reasonable modifications of Liberty's policies, practices, and procedures where those modifications were necessary to afford Plaintiff equal access to the educational program.

Reasonable modifications available to Liberty included, without limitation, a bereavement extension of the final assignment deadlines; a temporary suspension of the

assignment schedule pending resolution of the site HIPAA barriers; a transfer of the clinical placement to a safe site; and coordination with a Liberty disability-services professional to identify additional accommodations appropriate to Plaintiff's circumstances.

Liberty granted none of these modifications. Liberty did not refer Plaintiff to disability services. Liberty did not extend the assignment deadlines under Wright's own "highly exceptional and emergent situations" standard. Liberty did not evaluate the safety or accessibility of the placement.

Instead, on August 12, 2024, Wright and the Department of Counselor Education and Family Studies Remediation Committee issued the Academic Misconduct Notice described in Section D below.

Liberty's failure to provide reasonable accommodations was itself a proximate cause of the assignment-completion difficulties that Liberty then used as the predicate for the August 12, 2024 Academic Misconduct Notice.

Liberty's failure to provide reasonable accommodations violated Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and Liberty's own Nondiscrimination and Equal Opportunity Policy.

Plaintiff repeated the accommodations request in later correspondence with Liberty faculty and Advising during August and September 2024. Liberty did not act on those requests.

Plaintiff's repeated accommodations requests are catalogued in the 563-record phone log produced by Liberty's Registrar's Office at Plaintiff's request in March 2025.

Liberty's failure to provide accommodations was a foreseeable, direct, and proximate cause of Plaintiff's inability to complete two disputed assignments on the

schedule Wright refused to modify, and of the cascade of adverse actions that followed.

## D. August 12, 2024: Academic Misconduct Notice With No Evidence

On August 12, 2024, the Remediation Committee of the Department of Counselor Education and Family Studies, School of Behavioral Sciences, issued an "Exhibit - Reported Concerns (Misconduct Notice)" attributing the Academic Misconduct Report to Plaintiff's "faculty group supervisor" - Wright.

The Misconduct Notice itemized a series of site-related charges against Plaintiff, including alleged boundary issues, alleged incorrect hours logging, an alleged "failure to obtain site approval for the addition of an extra site supervisor," and removal from units.

Each of the site-related charges was contradicted charge-by-charge by pre-existing Liberty-authored records:

(a) the February 21, 2024 signed Off-Site Fieldwork Contract identified both Joss Pullan and Laura Runia as Plaintiff's co-supervisors from the outset of the placement, refuting the "failure to obtain site approval for the addition of an extra site supervisor" allegation;

(b) the August 2024 signed Supervision Verification Letter of Laura Lee Runia, LPCC/BBHT, Plaintiff's Project Turnabout site supervisor and Board-Approved Clinical Supervisor - contemporaneously executed at the close of the internship placement and later transmitted to Plaintiff on March 17, 2025 - confirmed that Ms. Runia personally supervised Plaintiff throughout the placement, completed the midterm and final evaluations with high scores, and verified and signed off on Plaintiff's clinical hours, refuting the "boundary issues" and "incorrect hours logging" allegations;

(c) Wright's own July 7, 2024 CCS-R Midterm score of 100/100 (the top rubric tier) refuted the general clinical-deficiency framing of the Misconduct Notice; and

(d) Wright's own August 14, 2024 Canvas comment on Attempt 1 Feedback ("This assessment provided by Mary's second site supervisor does not align with what I have observed in faculty supervision") expressly acknowledged the existence of the "second site supervisor" that the Misconduct Notice charged Plaintiff with adding without approval.

The August 12, 2024 Misconduct Notice was issued four days after Plaintiff's August 8, 2024 email to Wright disclosing her sister's death (paragraph 55). The temporal proximity of the Misconduct Notice to the protected disclosure and to the earlier May 14-15, 2024 reports of Wright's own conduct (paragraph 46) establishes a retaliatory motivation on the face of Liberty's own records.

On August 14, 2024, at 12:40 p.m., Wright submitted the Canvas "Attempt 1 Feedback" comment quoted at paragraph 70(d) above. Wright's own words expressly acknowledged the existence of the second site supervisor whose more-favorable assessment Wright disputed, contradicting the Misconduct Notice's charge that Plaintiff had added the second supervisor without approval, and simultaneously contradicting Wright's own July 7, 2024 top-tier CCS-R score five weeks earlier.

Under Title IX and under Liberty's own Sexual Misconduct Policy, adverse educational actions that follow within a short interval after protected activity give rise to an inference of retaliatory motive. The August 12, 2024 Misconduct Notice, issued four days after the August 8, 2024 protected disclosure and approximately three months after the May 14-15, 2024 reports of Wright's own conduct, satisfies the temporal-proximity element.

Under Liberty's Sexual Misconduct Policy Section 6.8, retaliation is defined to include "adverse changes in employment status or opportunities" and "acts or comments that are intended to discourage a person from engaging in activity protected under this Policy or that would discourage a reasonable person from engaging in activity protected under this Policy." The August 12, 2024 Misconduct Notice - initiating an academic-misconduct process on the basis of contradicted charges - falls within the Policy's own definition of a retaliatory adverse action.

On August 16, 2024, Liberty placed an administrative remediation hold on Plaintiff's student account with a system default end-date of December 31, 2099. Plaintiff received no advance notice of the hold, no written remediation plan, no meeting, and no appeal rights.

On September 25, 2024 at 5:51 a.m., Plaintiff exchanged emails with Liberty administrative personnel concerning the August 16, 2024 remediation hold, addressed in relevant part to the Dean's office. The September 25, 2024 email exchange (captured in the "RE: [External] Re: Hello Dean" thread) is Liberty's own contemporaneous written record confirming that Plaintiff was raising the hold with a Dean-level administrator within weeks of its imposition, and that Liberty's own personnel had received notice at the Dean level of Plaintiff's concerns about the hold. The email exchange is separately probative that Plaintiff did not receive, at the point of the hold's imposition on August 16, 2024, the advance written notice, remediation plan, meeting, or appeal rights that Liberty's Student Handbook and Sexual Misconduct Policy would ordinarily require - the very absence of which Plaintiff was raising with the Dean's office in the September 25, 2024 exchange.

The August 16, 2024 remediation hold was Liberty's first documented adverse action in the retaliation timeline. It occurred after the July protected activity (the

May-July 2024 disclosures to advisors and to Dr. Crable, and Dr. Crable's July 23 written acknowledgment), and after Wright's own July 7 top-tier CCS-R score.

Liberty did not provide Plaintiff with the Academic Misconduct Report itself. Liberty did not provide Plaintiff with the evidence on which the Report was based. Liberty did not provide Plaintiff with a written remediation plan identifying the specific behaviors alleged to require remediation, the timeline for completion, and the criteria for successful completion of the remediation.

Wright's own written extension standard of "highly exceptional and emergent situations" (paragraph 53) was not applied to Plaintiff when Plaintiff disclosed her sister's death, the HIPAA barriers, and the 680-hour trauma exposure.

Wright's own documented top-tier CCS-R score of 100/100 (paragraph 52) was not treated as evidence in support of Plaintiff during the misconduct proceeding.

Ms. Runia's signed evaluations of Plaintiff at Project Turnabout (paragraph 54) were not treated as evidence in support of Plaintiff during the misconduct proceeding.

The February 21, 2024 signed Off-Site Fieldwork Contract (paragraph 25) - which identified both Joss Pullan and Laura Runia as Plaintiff's co-supervisors from the outset - was not treated as evidence in support of Plaintiff during the misconduct proceeding.

In short, the August 12, 2024 Misconduct Notice and the August 16, 2024 remediation hold were imposed without any evidentiary foundation that survived comparison with Liberty's own pre-existing records.

## E. Improper Certification of Federal Loans During the Hold and During Less-Than-Full-Time Enrollment

Under Section 487(a)(20) of the Higher Education Act, 20 U.S.C. Section 1094(a)(20), and 34 C.F.R. Section 685.305, an institution that certifies federal student loans must do so on the basis of truthful and accurate representations concerning the student's enrollment status and eligibility.

On July 25, 2024 and on subsequent dates within the operative period, Liberty certified federal student loans for Plaintiff at Sallie Mae, notwithstanding that Liberty was contemporaneously in possession of the unsafe-site warnings referenced in Section A above, the site-supervisor evaluations referenced in Section B above, and (after August 16, 2024) the administrative remediation hold referenced in Section D above.

On or before the operative certification dates, Liberty had actual notice through its Registrar, Financial Aid, and Advising channels that Plaintiff's progression through the CACREP-accredited program had been blocked by the remediation hold. Notwithstanding that block, Liberty certified Plaintiff's enrollment for the purpose of federal loan disbursement.

On or before the operative certification dates, Liberty had actual notice through its Registrar's Office that Plaintiff's course load did not meet the full-time enrollment standard on which Liberty's certifications purported to rest. Notwithstanding the less-than-full-time enrollment, Liberty certified Plaintiff's enrollment at a level that triggered federal loan disbursement at Liberty's request.

The 49-record hold-entries subset of Liberty's own Registrar-produced 563-record account log (produced by Liberty's Registrar's Office at Plaintiff's request on March 11, 2025) contains contemporaneous quoted staff admissions of loan ineligibility, hold-manipulation to enable disbursement, and certification during blocked-registration periods.

Plaintiff has separately filed and supplemented complaints with the Consumer Financial Protection Bureau (CFPB Complaint 26-04143), with the Virginia Attorney General's Office (Consumer Complaint 26-04143), and with the Federal Student Aid Borrower Defense group (Case 35733121) documenting the improper certification pattern. The federal record on the Sallie Mae loans includes a June 28, 2026 supplement to the Virginia Attorney General.

Plaintiff separately filed a complaint with the Consumer Financial Protection Bureau against Sallie Mae, the lender to which Liberty had certified Plaintiff's federal student loans, seeking review of Liberty's certification accuracy and the servicer's failure to evaluate that accuracy. On April 6, 2026, Sallie Mae issued a written denial that closed the CFPB complaint without investigating Liberty's improper certification. Sallie Mae's denial did not evaluate the certification accuracy Plaintiff had squarely put at issue, did not review Liberty's contradictory contemporaneous actions (including the remediation hold and the FERPA-implicated employer disclosure), and rested only on Liberty's not-for-profit status. Sallie Mae's closure of the CFPB complaint without investigation left Liberty's underlying misrepresentations to the lender unaddressed and left Plaintiff liable for the balance of federal loans certified on the basis of representations that were, on Liberty's own records, inaccurate.

Plaintiff is now liable for the balance of federal loans certified by Liberty on the basis of representations that were, on Liberty's own records, inaccurate.

Liberty benefitted financially from the loan certifications through tuition payments credited to Plaintiff's student account during periods when Plaintiff was blocked by the remediation hold from earning the credit hours the tuition purported to purchase.

Liberty's improper certifications during holds and during less-than-full-time enrollment constitute (a) a breach of Liberty's contractual representations concerning enrollment status and eligibility, and (b) a substantive misrepresentation for purposes of Plaintiff's Borrower Defense to Repayment claim under 34 C.F.R. Section 685.206.

Liberty's improper certifications also directly implicate Standard 14.4 (Representation to Other Agencies) of the SACSCOC Principles of Accreditation, which the institutional accreditor is separately reviewing at Plaintiff's request.

## F. FERPA Disclosures to a Third-Party Employer Causing Termination

The Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. Section 1232g, prohibits Liberty from disclosing personally identifiable information from a student's education record to a third party without the student's written consent, except in narrow circumstances not applicable here.

In or about early November 2024 - several days before Plaintiff's November 13, 2024 termination described in paragraph 97 - Liberty disclosed to Western Mental Health Center - Plaintiff's employer during her clinical internship placement and her prospective post-program employer - personally identifiable information from Plaintiff's Liberty education record, including at minimum (i) the fact that Plaintiff had worked at Project Turnabout, (ii) the fact of an interpersonal or academic dispute between Plaintiff and Defendant Wright, and (iii) the fact that Plaintiff was subject to an administrative remediation hold at Liberty. Plaintiff had not authorized that disclosure. No exception under 34 C.F.R. Section 99.31 authorized that disclosure. The specific date and content of the disclosure are further developed in Plaintiff's contemporaneous July 31, 2026 dictated notes concerning the pre-termination conversation between Plaintiff and her Western Mental Health Center supervisor, described at paragraphs 103 and 99 below.

On November 13, 2024 - several days after Liberty's disclosure to Western Mental Health Center - Plaintiff attended an exit interview at Western Mental Health Center. During the exit interview, which was recorded and later transcribed, Plaintiff's supervisor confirmed that Plaintiff "didn't do anything wrong," terminated Plaintiff's employment that day citing "overstaffing" in the ARMS department and Plaintiff's status as "the last one hired," and confirmed that Plaintiff was "very welcome to reapply" and that Plaintiff's employment relationship supported use of Western Mental Health Center's human-resources office as a professional reference. The supervisor separately stated: "you're not getting let go for anything that you did. It's just, we have problems with our budget right now." The supervisor also acknowledged that he had previously attempted to catch Plaintiff on the preceding Thursday - a reference to the earlier pre-termination conversation Plaintiff describes at paragraph 103 below. The sequence - the earlier pre-termination conversation in which the supervisor disclosed the substance of Liberty's communications to him, followed several days later by the November 13, 2024 exit-interview termination framed as budget-driven notwithstanding the supervisor's repeated confirmation of Plaintiff's satisfactory performance - aligns with Liberty's disclosure of the remediation-hold and Wright-dispute status to the employer rather than with any performance-based termination rationale.

Plaintiff's contemporaneous account of the disclosure is on the record in the March 10, 2025 recorded conversation with Liberty staff (later transcribed as "Recording 14"): "Liberty actually called the job ... told them I was on a remediation hold. And so I lost my job because of that." Liberty's Title IX intake staff, on tape, did not dispute the reporting-timeline dates that Plaintiff recited.

The disclosure to Western Mental Health Center was made without Plaintiff's written consent and did not fall within any exception under FERPA or 34 C.F.R. Part 99.

As a direct and proximate result of Liberty's FERPA disclosure to Western Mental Health Center, Plaintiff was terminated from her employment on November 13, 2024, and suffered loss of income, loss of professional standing, and loss of the reference relationships necessary to continue her career.

[Reserved.]

On June 25, 2025 - approximately seven months after the November 13, 2024 termination and while Plaintiff was still without any Liberty-provided pathway to redress - Plaintiff dictated a contemporaneous complaint draft (memorialized as "Complaint x 3") addressed to Western Mental Health Center and to potential external oversight bodies. The June 25, 2025 dictated complaint draft documents Plaintiff's contemporaneous understanding that the November 13, 2024 termination followed Liberty's disclosure to the employer and was not, on the evidence known to Plaintiff, based on performance.

On or about July 31, 2026, Plaintiff dictated further contemporaneous notes concerning a specific pre-termination conversation with her Western Mental Health Center supervisor. According to Plaintiff's contemporaneous account, the supervisor - after Plaintiff returned from a client visit - stated to Plaintiff that (a) he had telephoned Liberty University and spoken with Plaintiff's advisor in the Clinical Mental Health Department (identified in Plaintiff's notes as possibly "Paige"); (b) Liberty had told him that Plaintiff had worked at Project Turnabout; (c) Liberty had told him that Plaintiff had issues with Defendant Dr. Jason Wright; and (d) Liberty had told him that Plaintiff was in a remediation hold. The supervisor advised Plaintiff on the record that "it looks like you aren't going to get out of this remediation hold" and suggested that Plaintiff should transfer schools. Plaintiff's response - that master's-level credits do not routinely transfer beyond a nine-credit cap - was uncontested.

The July 31, 2026 dictated notes referenced in paragraph 103 identify a specific admission by Plaintiff's Western Mental Health Center supervisor that Liberty personnel had communicated to him, in advance of Plaintiff's termination, personally identifiable information from Plaintiff's Liberty education records, including (i) the fact of Plaintiff's Project Turnabout placement, (ii) the fact of an interpersonal or academic dispute between Plaintiff and Defendant Wright, and (iii) the fact of Plaintiff's remediation-hold status. Each of these disclosures is a disclosure of information from an "education record" under 20 U.S.C. Section 1232g(a)(4) and is subject to the written-consent requirement of 20 U.S.C. Section 1232g(b)(1). None of the recognized exceptions under 34 C.F.R. Section 99.31 authorized these disclosures.

On July 29, 2026, Plaintiff, through her document custodian, transmitted a Data Practices Request under the Minnesota Government Data Practices Act, Minn. Stat. Section 13.03, to Western Mental Health Center (and to Lyon County as the responsible governing authority for the entity), requesting for the period May 1, 2024 through November 30, 2024 all data, records, or communications in the entity's possession relating to (a) communications with Liberty University, including emails, phone logs, supervisor notes, internal memos, and documentation of any disclosures received from Liberty University; (b) records relating to Plaintiff, including supervisor notes, internal communications, incident documentation, safety-related communications, and any records referencing her internship placement, supervision, or termination; and (c) any documentation of safety or emergency concerns during the period.

On July 29, 2026, at 12:48 p.m., the Lyon County Administrator, Loren A. Stomberg, responded in writing: "Lyon County has no data responsive to this request." The response produced no communications with Liberty University, no phone logs, no supervisor notes concerning Plaintiff, no incident documentation, no safety-related communications, no records concerning Plaintiff's internship placement, supervision, or

termination, and no documentation of safety or emergency concerns.

The absence of any responsive documentation is probative rather than exculpatory. Under Plaintiff's contemporaneous account (paragraphs 97, 97, and 98) and under Liberty's own Registrar-produced call-log record, communications between Liberty and Western Mental Health Center in the operative period did in fact occur; standard employer practice would have produced at least reference-check, hiring-verification, personnel, or safety call logs on the entity's side. The complete zero-record response is inconsistent with the ordinary course of business for a governmental mental-health entity and is inconsistent with the June 25, 2025 dictated complaint draft (paragraph 102) and the July 31, 2026 dictated pre-termination-conversation notes (paragraph 103), which Western Mental Health Center did not produce in response to the Data Practices Request notwithstanding their facial responsiveness. The zero-record response therefore either (a) reflects intentional non-retention or destruction of records, or (b) reflects a withholding under an asserted personnel-confidentiality or FERPA-adjacent privilege not identified in the entity's response. Either alternative is inconsistent with the entity's obligations under Minn. Stat. Section 13.03 and either alternative is separately consistent with Plaintiff's account of the underlying FERPA disclosure.

Plaintiff's Project Turnabout site supervisor Laura Lee Runia had, months earlier, evaluated Plaintiff at high performance levels on both the internship midterm and the internship final evaluation (paragraph 51). Plaintiff's Western Mental Health Center supervisor, in the November 13, 2024 exit interview transcript, separately confirmed Plaintiff "didn't do anything wrong" and framed the termination as budget-driven (paragraph 97). The pattern - two independent workplace supervisors, at two independent employment sites, each contemporaneously confirming Plaintiff's satisfactory performance - contradicts Liberty's own narrative of Plaintiff as a performance-problem

candidate and supports the inference that the November 13, 2024 termination was a proximate consequence of Liberty's FERPA-implicated disclosure rather than of any performance deficiency.

## G. Delayed Title IX Intake

Plaintiff made contemporaneous reports of Wright's inappropriate conduct to her Liberty advisors on May 14-15, 2024 (paragraph 46). Those reports are memorialized in Liberty's own Registrar-produced 563-record account phone log.

Under Liberty's Sexual Misconduct Policy and under Liberty's Title IX training curriculum, an advisor who receives a report of sexual misconduct from a student is a mandated reporter and is required to route the report to the Office of Equal Rights and Title IX for intake.

Liberty did not open a formal Title IX intake based on Plaintiff's May 14-15, 2024 reports. Liberty did not offer Plaintiff supportive measures. Liberty did not conduct an initial assessment.

On or about November 11, 2024 - approximately six months after Plaintiff's initial reports - one of Plaintiff's Liberty advisors, acting as a mandated reporter, filed a report of Wright's conduct with the Office of Equal Rights and Title IX.

Liberty's own Notice of Determination (Case No. 2024046901), issued July 17, 2026, purports to identify May 7, 2025 as the date of Plaintiff's first report, notwithstanding the May 14-15, 2024 phone-log records and the November 11, 2024 mandated-reporter filing that pre-date May 7, 2025 by twelve months and five months respectively.

The formal complaint was filed on June 11, 2025. The delay between Plaintiff's May 14-15, 2024 reports and the June 11, 2025 formal complaint is approximately

thirteen months. That delay, without corresponding supportive measures or interim protective actions, is itself a form of Title IX process failure and is a proximate cause of Plaintiff's continuing exposure to the retaliation and remediation-hold consequences described elsewhere in this Complaint.

## H. March 7, 2025 Remediation Meeting Without Evidence Review

On March 7, 2025, Liberty convened a Remediation Meeting between Plaintiff and program decision-makers Defendant Camden and a co-facilitator (identified in the record as Dr. Schaefer or Dr. Taylor). The meeting was recorded.

At the Remediation Meeting, the facilitators repeatedly asserted that Plaintiff had filed a Title IX report and that the report had been adjudicated as "unfounded." The March 7, 2025 statement about a Plaintiff-filed Title IX report pre-dated the May 7, 2025 date the Determination itself identifies as Plaintiff's first report and pre-dated the June 11, 2025 formal complaint by three months.

The facilitators did not review with Plaintiff the evidence supporting the August 12, 2024 Misconduct Notice. The facilitators did not display or describe the Academic Misconduct Report. The facilitators did not identify the specific behaviors alleged to require remediation or the criteria for successful remediation.

Plaintiff was not permitted to read a prepared statement at the Remediation Meeting. Plaintiff had prepared and attempted to read a statement addressing the site-safety disclosures, the Wright conduct reports, the accommodations denials, and the contradicted charges in the Misconduct Notice. The facilitators declined to allow the statement into the meeting.

The Remediation Meeting captured, on the record, pathologizing statements directed at Plaintiff, including "I think you do believe what you're saying." A trained

Liberty Title IX intake staff member - Trinity, Deputy Title IX Intake Officer - separately captured on tape statements including "I'm not sure that that would meet our policy definition for retaliation and interference" and "this information doesn't fit into the discrimination definition."

The Remediation Meeting also captured Plaintiff's account, on the record, that Liberty advising had told her to "forgive him. And just not to say anything through your school" - Liberty's own advising-staff instruction to Plaintiff not to route her concerns through Liberty's internal channels.

The March 7, 2025 Remediation Meeting did not comport with Liberty's written remediation policy, which requires review of the evidence supporting the remediation charge, a written remediation plan with objective criteria for successful completion, and an opportunity for the student to be heard on the record.

On June 11, 2025, Liberty University's Cashiering and Treasury Services (cashiersupport@liberty.edu) issued a written Payment Receipt (Transaction ID 121077950618) to Plaintiff confirming a graduation-associated transaction credited to Plaintiff's student account in the amount of $100.00 (Transaction Type: External Scholarship). The receipt is Liberty's own contemporaneous written record that Liberty accepted, credited, and formally receipted a graduation-associated payment to Plaintiff's student account on June 11, 2025. Liberty issued the receipt notwithstanding that Liberty knew of, and had documented in its own Registrar records, the pre-existing August 16, 2024 administrative remediation hold. Liberty's acceptance of the graduation-associated payment is Liberty's own acceptance of consideration on the contractual undertaking to confer the degree upon completion.

On June 17, 2025 - three months after the March 7, 2025 Remediation Meeting - Liberty Registrar Julia Jimenez emailed Plaintiff that the School of Behavioral Sciences

had placed Plaintiff on program dismissal and would not allow Plaintiff to pursue any degree within that school, including the Human Services degree.

The June 17, 2025 program-dismissal email is Liberty's own written confirmation that Plaintiff was foreclosed from any degree pathway in the School of Behavioral Sciences on the basis of the March 7, 2025 remediation process that did not review the evidence.

On November 13, 2024, Plaintiff had been terminated from her Western Mental Health Center employment - concurrent with her clinical internship and prospective post-program employment - on the basis of Liberty's FERPA disclosure to that employer several days earlier (paragraphs 96 through 99). The June 17, 2025 program-dismissal email compounded the injury by foreclosing Plaintiff's ability to complete the program through which she could have continued her clinical career.

## I. March 11, 2026: NDA Framework Blocking Evidence Access

On March 11, 2026, Liberty's Deputy Title IX Coordinator served Plaintiff with two Non-Disclosure Agreements: an "Advisor Non-Disclosure Agreement" for any advisor Plaintiff selected, and a "Party Non-Disclosure Agreement" for Plaintiff herself.

The NDA framework required Plaintiff and her advisor to sign the NDAs before Liberty would provide access to the directly-related evidence and to the Investigative Report in the Title IX process.

The Advisor NDA limited evidence access to a single advisor and prohibited sharing of evidence with future counsel, experts, or external oversight bodies, including the Office for Civil Rights, the State Council of Higher Education for Virginia ("SCHEV"), the Higher Learning Commission, and Liberty's institutional accreditor SACSCOC.

On March 18, 2026, Deputy Title IX Coordinator of Investigations Kelsey File issued an "Access Notice" letter that stated in the same letter both that "the University provided access to the Directly Related Evidence" (paragraph 1) and "Kindly note that you will not be given access until you return a signed Non-Disclosure Agreement" (paragraph 2). The letter is Liberty's own written acknowledgment that "provided access" was expressly conditioned on NDA signature.

On April 17, 2026, Deputy Title IX Coordinator of Investigations Kelsey File issued a substantively identical Access Notice letter for the Investigative Report, using the same "provided access" formulation with the same NDA-signature condition. The April 17, 2026 letter also carries a red-text page footer treating "unauthorized distribution" as "retaliation or interference."

Liberty had actual notice of the NDA scope and its effect on Plaintiff's access to counsel and to external oversight bodies. On April 19, 2026, Plaintiff supplemented her Office for Civil Rights complaint (Case OCREMAIL00766493G) with a detailed submission documenting the NDA-conditioned access, the attorney-withdrawal impact on Plaintiff's representation, and Liberty's continuing advancement of the adjudication phase while Plaintiff remained unable to access evidence.

Under 34 C.F.R. Section 106.45(b)(5)(vi) - the operative Title IX regulation during the period - an institution is required to send to each party "any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint," subject only to reasonable measures to prevent unauthorized disclosure. The regulation does not authorize an institution to condition the required evidence access on the party's execution of an instrument surrendering the party's right to communicate with external oversight bodies about the evidence.

On July 7, 2026, the U.S. Department of Education issued Title IX Enforcement Directive DCL 109477 (Dear Colleague Letter) confirming continued enforcement of the operative Title IX regulations during the relevant period. The Directive is a public federal-standard reference against which Liberty's NDA framework can be evaluated.

On June 24, 2026, Plaintiff filed a written compliance report with Liberty's Ethics and Compliance office identifying the NDA framework as an interference with the Title IX process, and setting out the full inline text of both the Advisor NDA and the Party NDA for the compliance office's review.

On July 7, 2026, Liberty's Office of Equal Rights and Title IX published a document titled "Information for Participating Parties" purporting to state Liberty's own interpretation of Title IX grievance rights. That document remains Liberty's own written articulation of the process against which its NDA-gated evidence access can be measured, and does not resolve the compliance concern.

Liberty did not modify the NDA framework in response to Plaintiff's June 24, 2026 compliance report. Liberty did not respond to Plaintiff's June 24, 2026 report on the merits.

Liberty's NDA framework was a condition precedent to any meaningful participation by Plaintiff in the Title IX process. As Plaintiff and her advisor were not prepared to relinquish the right to communicate with external oversight bodies about the evidence, the NDA framework functioned as a denial of evidence access under color of a signed instrument.

The March 4-6, 2026 evidence window under the Investigative Report timeline closed while Plaintiff was still without unconditional access to the evidence.

Plaintiff's inability to access the evidence directly caused Plaintiff's inability to prepare a substantive response, to identify witnesses to be called at the live hearing, and to instruct advisory counsel on cross-examination topics.

**J. May 27, 2026: Live Hearing Held Without Evidence Access**

Liberty scheduled the live hearing under 34 C.F.R. Section 106.45(b)(6) for May 27, 2026.

On the date of the hearing, Plaintiff had (i) received directly-related evidence and the Investigative Report only under the NDA gate, (ii) not received a response to the compliance concern subsequently raised on June 24, 2026, and (iii) had no advisor access to the record on terms consistent with 34 C.F.R. Section 106.45(b)(5)(iv).

Plaintiff did not participate in the May 27, 2026 hearing under those conditions. Liberty's July 17, 2026 Notice of Determination later characterized Plaintiff's non-participation as an exercise of a "right" ("Complainant exercised her right to not participate in the hearing," page 4).

Framing non-participation under conditions of NDA-conditioned evidence access as an exercise of "right" inverts the record. The pre-hearing exchanges from April to May 2026 - including the Emergency Response Team Live Hearing Availability and Pre-Hearing Meeting emails - are catalogued in the operative Title IX case file and available for the Court.

Liberty conducted the May 27, 2026 hearing in Plaintiff's absence and made findings of fact on that record.

Under 34 C.F.R. Section 106.45(b)(6)(i), a live hearing must include cross-examination by each party's advisor. Because Plaintiff's advisor had not been permitted unconditional access to the evidence, no meaningful cross-examination was

possible even in Plaintiff's absence.

The May 27, 2026 hearing therefore failed to satisfy the essential procedural requirements of 34 C.F.R. Section 106.45.

The May 27, 2026 hearing also failed to satisfy Liberty's own Sexual Misconduct Policy Sections 11.7.5 through 11.7.6, which parallel the federal regulation and provide additional procedural protections.

## K. July 17, 2026: Notice of Determination Without Evidence Review

Under Section 11.7.6 of Liberty's Sexual Misconduct Policy, the written notice of determination is required to be issued approximately twenty-five business days after the live hearing. The May 27, 2026 hearing therefore required a written notice of determination by approximately July 1, 2026.

Liberty did not issue a written notice of determination by July 1, 2026. Instead, the record contains a July 1, 2026 "Fw_ Case Update" email and a July 6, 2026 "Fw_ Notice of Determination Update" email - "updates" substituted for the required written determination.

On July 17, 2026, Liberty issued the Notice of Determination in Case No. 2024046901 - approximately eleven business days after the twenty-five-business-day mark. The Notice of Determination is a 24-page document signed by Title IX Hearing Officer Stephen J. Vaughan and transmitted by Deputy Title IX Coordinator Lukas Hafeli.

The Notice of Determination finds the Respondent (Wright) "not responsible" for Title IX Quid Pro Quo Sexual Harassment.

The Notice of Determination reaffirms the March 11, 2026 NDA framework as a condition of appeal-file access (Section 11.7.8) and places a page-footer treating unauthorized redistribution as "retaliation or interference."

The Notice of Determination characterizes Plaintiff's non-participation at the May 27, 2026 hearing as an exercise of "right" (page 4).

The Notice of Determination's factual findings collide with Liberty's own pre-existing records in numerous respects, including without limitation:

(a) the Determination finds that Plaintiff "did not report Respondent's alleged conduct to advisors in May" (Determination pp. 8-9), while Liberty's own Registrar-produced May 14-15, 2024 Advising phone-log records document exactly the reports the Determination says did not occur;

(b) the Determination reaffirms the NDA framework, notwithstanding 34 C.F.R. Section 106.45(b)(5)(vi) and the Department of Education's July 7, 2026 Enforcement Directive DCL 109477;

(c) the Determination characterizes evidence access as "provided" on March 18, 2026 and April 17, 2026, notwithstanding that the same access-notice letters conditioned access on NDA signature;

(d) the Determination frames Plaintiff's non-participation as an exercise of "right," notwithstanding that the hearing was held under an unresolved NDA restraint on evidence access;

(e) the Determination relies on Wright's account of clinical performance, notwithstanding that Wright's own July 7, 2024 CCS-R Midterm score of 100/100 - a Liberty-authored record - contradicts that account; and

(f) the Determination relies on Wright's account of the second-supervisor issue, notwithstanding Wright's own August 14, 2024 Canvas comment expressly referencing "Mary's second site supervisor" and the February 21, 2024 signed Fieldwork Contract listing both co-supervisors from the outset.

The July 17, 2026 Notice of Determination was issued approximately twenty-four hours after Plaintiff filed the initial third-party accreditation complaint packet on July 16, 2026. The sub-twenty-four-hour timing is consistent with, and directly parallels, the sub-twenty-four-hour pivot documented in August 2024 between Plaintiff's Project Turnabout safety disclosures and Liberty's remediation-hold and academic-misconduct actions.

The July 17, 2026 Notice of Determination is Liberty's operative institutional artifact of the July 17, 2026 institutional posture. It is the record on which any Title IX civil action must be measured, and it is the record with which Liberty's own contemporaneous documents most directly collide.

Liberty's issuance of the Notice of Determination without meaningful review of the contradicting Liberty-authored records violated Section 6.8 (Retaliation and Interference) of Liberty's Sexual Misconduct Policy, Section 11.7.5 through 11.7.8 of Liberty's Sexual Misconduct Policy, and 34 C.F.R. Section 106.45.

## L. Blocked Appeal Rights and OCR Dismissal

Under Section 11.7.8 of Liberty's Sexual Misconduct Policy, the appeal of the Notice of Determination is subject to the same NDA framework that governed access to the evidence in the initial adjudication. Plaintiff's access to the appeal file was therefore conditioned on the same NDA signature that Plaintiff and her advisor had declined to execute for the initial adjudication.

The appeal was routed to the same Office of Equal Rights and Title IX in which the Respondent had been evaluated - the office of the very department in which the Respondent (Wright) is a faculty member. In substance, the appeal was routed to the Respondent-adjacent office rather than to an independent appellate authority.

On June 3, 2026, the U.S. Department of Education Office for Civil Rights issued a Dismissal Letter for Case 11-26-2229 dismissing Plaintiff's prior OCR complaint on the basis that Liberty's internal grievance process was "still open." The June 3, 2026 OCR Dismissal Letter forecloses one federal-oversight pathway and creates a dependency on Liberty's own internal process - the very process that Plaintiff's evidence establishes was nonfunctional.

Plaintiff refiled with the Office for Civil Rights after Liberty's issuance of the July 17, 2026 Notice of Determination. As of the date of this Complaint, the refiled OCR matter is technically open but no OCR investigator has been assigned, and only automated status replies have been received.

Under 34 C.F.R. Section 106.45(b)(8), a party has the right to appeal a determination on the bases specified in the regulation, including procedural irregularity, new evidence, and conflict of interest or bias. Liberty's NDA-gated appeal-file access forecloses Plaintiff's ability to identify procedural irregularity or bias without exposing herself to Liberty's own definition of retaliation for unauthorized redistribution of the appeal file.

The June 3, 2026 OCR Dismissal Letter also documents the same "still-pending" objection that the July 17, 2026 Notice of Determination and the July 21, 2026 appeal cutoff now remove.

Plaintiff has continued to pursue every available oversight pathway, including filings with SCHEV (March 24, 2026 and July 1, 2026 escalation), the Federal Student

Aid Borrower Defense group (Case 35733121, supplemented July 16, 2026), the Consumer Financial Protection Bureau (Complaint 26-04143), the Virginia Attorney General (Consumer Complaint 26-04143, supplemented June 28, 2026), the Office of Inspector General (Case C26IOU06784), and the Higher Learning Commission (July 2026 filings).

Multiple program-specific accreditors declined review of Plaintiff's shared-systems concerns on jurisdictional grounds. SACSCOC, the institutional accreditor with jurisdiction over Liberty as an institution, has received formal complaints; as of the date of this Complaint, no substantive investigative response has issued.

The pattern establishes an oversight gap in which Liberty's own internal process is the only forum available, and that process is - on Plaintiff's evidence and Liberty's own written record - nonfunctional.

Plaintiff has exhausted her administrative options to the extent required by law, and no administrative exhaustion requirement precludes this action.

## M. Two-Year Title IX Grievance

Plaintiff's initial protected activity concerning Wright's conduct occurred on May 14-15, 2024 (paragraph 46).

Liberty's Notice of Determination was issued on July 17, 2026 - approximately twenty-six months later.

Under 34 C.F.R. Section 106.45(b)(1)(v), a Title IX grievance process must "include reasonably prompt time frames for conclusion of the grievance process." A twenty-six-month resolution timeline for a single formal complaint - during which the complainant is placed on program dismissal, is subjected to a FERPA-implicated

employment termination, is denied unconditional access to the evidence, and is denied meaningful participation in the hearing - is not consistent with the regulation.

Under Section 12 of Liberty's Sexual Misconduct Policy, Liberty is required to provide a "prompt and equitable process" for the resolution of complaints. The twenty-six-month timeline is not consistent with Liberty's own policy.

The delay itself is a form of Title IX process failure and is a proximate cause of the compounded harms to Plaintiff described elsewhere in this Complaint.

**N. FERPA Shields Blocking State and Federal Oversight Inquiries**

Beginning in the spring of 2025 and continuing through the operative period, Liberty invoked FERPA as a basis to decline to respond to state and federal oversight inquiries concerning Plaintiff's case.

State legislators from Virginia inquired with Liberty concerning Plaintiff's case in the summer of 2026. Liberty invoked FERPA as a basis for declining to respond substantively.

SCHEV (the State Council of Higher Education for Virginia) inquired with Liberty on March 24, 2026 and again on July 1, 2026. Liberty invoked FERPA in its response, notwithstanding that Plaintiff had provided written consent to the disclosure of her records to SCHEV.

175A. On August 6, 2026, Plaintiff formally submitted the SCHEV Student Complaint Form via the SurveyMonkey intake pathway, thereby placing her complaint on SCHEV's official initial-intake docket. The complaint invokes SARA Section III.B, Va. Code Section 23.1-219(A)(3), Va. Code Section 23.1-233.1, SCHEV Award Letter Guidance, and 8 VAC 40-31-290, and requests referral to the Qualified Education Loan Ombudsman. SurveyMonkey acknowledgment was received the same day. The August 6, 2026 formal submission is the

record that SCHEV policy requires (as distinct from the March 24 and July 1, 2026 correspondence referenced in paragraph 175 above), and it moves Plaintiff's SCHEV pathway to formal-intake status notwithstanding Liberty's continuing FERPA-shield posture. 176. The Office for Civil Rights inquired with Liberty during the pendency of Plaintiff's OCR complaint. Liberty invoked FERPA to limit the scope of its production, notwithstanding the exception under 34 C.F.R. Section 99.31(a)(3) permitting disclosure to authorized federal-oversight authorities.

Liberty's use of FERPA as a shield to block state and federal oversight inquiries - while simultaneously making unauthorized FERPA-protected disclosures to Plaintiff's employer (paragraphs 98-99) - reflects an asymmetric compliance posture in which FERPA is invoked to protect the institution rather than the student.

FERPA does not authorize an institution to withhold aggregate policy or procedural information from state or federal oversight authorities. FERPA does not authorize an institution to withhold information a student has authorized in writing to be released.

Liberty's FERPA-shield posture is a proximate cause of Plaintiff's continuing inability to obtain independent state or federal review of Liberty's internal process.

## O. Mandatory Reporters Silenced by Threat of Retaliation

Under Liberty's Sexual Misconduct Policy, Liberty faculty, staff, and administrators are designated as mandated reporters and are required to route reports of sexual misconduct to the Office of Equal Rights and Title IX.

Liberty's Title IX training curriculum, documented in the 68-page Title IX compliance training records for 2022-2026 and in the monthly Ethics and Compliance training logs for January through June 2026, establishes that Liberty faculty and staff

were trained on the mandated-reporter obligation during the operative period.

Plaintiff disclosed Wright's conduct to multiple Liberty faculty and staff during the operative period. Only one of those faculty or staff members - the mandated reporter identified in paragraph 51 - filed a Title IX report.

The remaining faculty and staff who received Plaintiff's disclosures did not route the reports through the Title IX intake process. Several of them explained to Plaintiff in words or substance that they feared retaliation from Liberty's institutional structure if they made a mandated-reporter filing.

Liberty's Title IX intake staff - captured on tape in Recordings 38 and 42 - narrowed the operative definitions of "retaliation," "interference," and "discrimination" to Liberty-policy-specific constructions that excluded conduct that would qualify under the federal regulation.

The combination of the retaliation-fear pattern among mandated reporters and the narrowed intake definitions produced a Title IX intake environment in which reports of the type Plaintiff and her advisors attempted to make were, on Liberty's own record, not consistently routed to intake as the Policy required.

**<u>P. Clery Act Reporting Failures During the Federal Post-Review Monitoring Window</u>**

The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. Section 1092(f) ("Clery Act"), imposes recordkeeping and disclosure obligations on institutions that participate in federal financial aid programs, including the obligation to record reports of dating violence, domestic violence, sexual assault, and stalking in the institution's Daily Crime Log, to include those reports (in aggregate) in the institution's Annual Security Report ("ASR"), and to issue Timely Warnings and Emergency Notifications where required.

On March 5, 2024, the U.S. Department of Education and Liberty University entered into a Program Review Determination and Post-Review Monitoring Settlement Agreement resolving prior findings that Liberty had failed to comply with numerous Clery Act obligations, including sexual-violence prevention and response requirements added by Section 304 of the Violence Against Women Act. The settlement imposed a fourteen million dollar civil penalty, two million dollars in mandatory compliance expenditures, and a two-year Post-Review Monitoring period running from March 5, 2024 through March 5, 2026.

Plaintiff's July 23, 2024 report of unsafe site conditions at Project Turnabout to Director of Clinical Training Dr. April R. Crable (paragraphs 31-32) occurred during the Post-Review Monitoring period. Liberty did not record that report in the Daily Crime Log, did not include the substance of the report in the applicable Annual Security Report, and did not issue any Timely Warning or Emergency Notification concerning the site conditions Plaintiff had disclosed.

Plaintiff's May 14-15, 2024 reports to her Liberty advising staff of Wright's inappropriate sexualized conduct in the COUC 693 classroom (paragraphs 46-50) occurred during the Post-Review Monitoring period. Those reports concerned conduct that, if credited, would qualify as sexual harassment reportable under the Clery Act as amended by the Violence Against Women Act. Liberty did not record those reports in the Daily Crime Log, did not include the substance in the applicable Annual Security Report, and did not issue any Timely Warning.

The November 11, 2024 mandated-reporter filing referenced in paragraph 51 also occurred during the Post-Review Monitoring period. Liberty did not record that filing in the Daily Crime Log, did not include the substance in the applicable Annual Security Report, and did not issue any Timely Warning.

The June 11, 2025 formal Title IX complaint filed by Plaintiff (Case No. 2024046901) also occurred during the Post-Review Monitoring period. On Plaintiff's information and belief, the substance of that formal complaint likewise did not appear in the applicable Annual Security Report, did not appear in the Daily Crime Log, and did not trigger any Timely Warning.

The Clery Act obligations Liberty owed with respect to each of the foregoing reports were the very obligations Liberty had, weeks before, agreed to comply with under the March 5, 2024 Post-Review Monitoring Settlement Agreement. Liberty's non-recording of these reports during the monitoring period is inconsistent with the express terms of the settlement and with 34 C.F.R. Section 668.46.

Plaintiff has separately transmitted the Clery reporting concerns identified above to the U.S. Department of Education Clery Compliance Division. The federal record includes Plaintiff's Clery Act Enforcement Referral describing the CY2023, CY2024, and CY2025 pattern, including geographic misclassification of Project Turnabout as non-existent noncampus property, unfootnoted CY2023 restatement, sexual-offense suppression signal, hazing omission, timely-warning failures, daily-crime-log deficiencies, and Title IX statistical blackout during the 2024 Post-Monitoring period.

## Q. Institutional Pattern of Ignoring Sexual-Harassment Allegations Against Faculty - Sworn Testimony From Parallel Federal Action

In the parallel federal action *Brake v. Liberty University, Inc., et al.*, No. 6:25-cv-00017-NKM-CKM (W.D. Va.), the Deposition of Diane Padilla, taken November 13, 2025 and filed as Doc. 69-8 (Exhibit E) to Liberty's January 22, 2026 Motion for Summary Judgment, contains sworn testimony bearing on the institutional practice of Liberty University's Title IX apparatus. Diane Padilla is an outside attorney with the firm Lathrop GPM who served as Liberty's Interim Title IX Coordinator during

the summer of 2024 and reviewed the case files then in the possession of Liberty's Office of Equity and Compliance / Title IX. As an outside professional with no institutional stake in the outcome, Padilla's sworn observations concerning the practice of Liberty's Title IX apparatus are neutral third-party evidence of that practice.

Padilla testified, in substance and in her own words, that a case in the caseload she reviewed contained an allegation of potential sexual harassment by a Liberty professor that had been ignored rather than escalated through the Title IX process. Padilla testified in relevant part: "The student made a couple of comments that ... I don't know if he was physically close to - or too touchy or something like that ... my impression was the student felt uncomfortable ... so to just ignore an allegation of potential sexual harassment at school was troubling to me." (Deposition of Diane Padilla, Doc. 69-8, PDF pp. 31-32; transcript pp. 30-31.)

Padilla's sworn observation is admissible in this action under Federal Rule of Evidence 406 as evidence of Liberty's routine practice, and under Federal Rule of Evidence 404(b) as evidence of motive, opportunity, intent, and absence of mistake with respect to Liberty's response to allegations of faculty sexual harassment. The observation is neutral third-party evidence, from an outside attorney retained by Liberty itself, that at least one allegation of faculty sexual harassment then pending in Liberty's Title IX case files had been "ignored" rather than routed through the Title IX process.

The pattern Padilla observed in another Liberty Title IX case file is the same pattern Plaintiff experienced in her own case. Plaintiff's May 14-15, 2024 reports of Defendant Wright's inappropriate sexualized conduct in the COUC 693 classroom were not opened as a formal Title IX intake for approximately six months (paragraph 104); Plaintiff's July 2024 site-safety disclosures to Dr. Crable were not routed through the Title IX process (paragraph 40); Plaintiff's August 2024 accommodations requests were

not routed to disability services (paragraph 61); and the mandated-reporter obligations that would have required routing were, as reflected in Section O, silenced by the fear of retaliation from Liberty's institutional structure.

The convergence between Padilla's independent sworn observation and Plaintiff's own experience is not accidental. It reflects an institutional practice of Liberty's Title IX apparatus - documented under oath by an outside professional retained by Liberty itself - of declining to escalate allegations of faculty sexual harassment through the Title IX process. This institutional practice is the operative context in which Defendants' response to Plaintiff's reports must be evaluated, and it is directly probative of the deliberate-indifference element pleaded in Count II below.

## R. Newly-Extracted Doc 69 Sub-Exhibits: Coordinated Termination Memo, Ban-from-Campus and Jurisdictional-Insulation Tactic, and Presidential-Level "Perceptions Are Not Reality" Statement

On August 8, 2026, five sub-exhibits attached to Liberty University's own January 22, 2026 Motion for Summary Judgment (Doc. 69) in *Brake v. Liberty University, et al.*, No. 6:25-cv-00017-NKM-CKM (W.D. Va.) - previously catalogued as "not extracted" in the workfile index of the companion Staff Depositions Cross-Analysis - were text-extracted and reviewed. Each is preserved on the *Brake v. Liberty* public federal-court docket and is self-authenticating for use in this action under Federal Rule of Evidence 902(4).

**Doc 69-4 (5 pp) - The four-employee coordinated-termination memo authored by Senior Vice President of University Compliance Ashley Reich.** Doc. 69-4 comprises (i) a March 19, 2024 email from Reich to EVP-Human Resources Steve Foster and HR Director Steven Ferro announcing that Liberty was "beginning to initiate disciplinary action for Peter Brake (and likely others)" more than three months before the

termination, and (ii) a June 20, 2024 four-page memo from Reich to Foster proposing termination of four Liberty Office of Equity and Compliance / Title IX employees - Nathan Friesema, Liz Hallgren, Erika Woolfolk, and Peter Brake - six days before the coordinated June 26, 2024 termination call. Reich later admitted under oath (Reich Deposition Doc. 69-3, PDF pp. 165-166; transcript p. 166:4-8) that the June 20, 2024 memo was drafted "conferring with outside counsel." The memo documents Liberty's institutional practice of coordinated adverse action against multiple compliance-office employees through the same senior-officer-plus-counsel channel that adjudicated Plaintiff's Title IX complaint against a Liberty faculty member in the same period.

**Doc 69-9 pp. 175-180 (6 pp) - The Brake-Padilla May 30 - June 28, 2024 email chain, including Brake's written question on the day of his termination: "Why was my complaint delayed three weeks?"** These six pages of email correspondence between Peter Brake (a Liberty Title IX Investigator who filed a formal internal complaint against SVP Reich on May 30, 2024) and Diane Padilla (Liberty's Interim Title IX Coordinator, whose sworn deposition testimony is quoted at paragraph 195 above) were filed inside Liberty's own January 22, 2026 Motion for Summary Judgment as the last six pages of Liberty's Sexual Misconduct Policy exhibit. The chain includes: (a) Brake's May 30, 2024 email to Padilla filing a Formal Complaint against Reich (Doc. 69-9 p. 178); (b) Padilla's May 31, 2024 confirmation-and-scheduling reply (Doc. 69-9 p. 180); (c) Padilla's June 26, 2024 email at 6:49 PM confirming: "I am aware that your employment with Liberty ended today" (Doc. 69-9 p. 177); (d) Brake's June 26, 2024 email at 7:17 PM asking in writing: "Who at LU authorized me to work from home? What was Ashley told about me working from home? Why was my complaint delayed three weeks?" (Doc. 69-9 p. 175); and (e) Padilla's June 28, 2024 email replying: "As the Title IX Coordinator, I authorized you to work from home as a supportive measure. I simply let Kasey and Ashley know that you requested to work from home and

I approved it. I did not provide an explanation as to why you requested to work remotely" (Doc. 69-9 p. 176). Brake's contemporaneous written question on the day of his termination - "Why was my complaint delayed three weeks?" - is a first-person whistleblower question about Title IX complaint-processing timeliness posed by a Liberty Title IX Investigator himself, on Liberty's own docket, in Liberty's own MSJ evidence.

**Padilla's June 28, 2024 email documentarily contradicts Reich's sworn deposition testimony.** Padilla wrote to Brake that she "let Kasey and Ashley know that you requested to work from home and I approved it." Reich, in her December 1, 2025 deposition, testified she "had not been made aware of" Brake's OEC complaint until "during this particular lawsuit" (Reich Deposition Doc. 69-3, PDF p. 166; transcript p. 165:7-10) and that she was made aware "some time period later" of the work-from-home accommodation "obviously during this particular lawsuit" (Reich Deposition Doc. 69-3, PDF p. 177; transcript p. 177:1-11). Padilla's contemporaneous email establishes that Reich was on notice - in the same period Reich was co-authoring the four-employee termination memo referenced in paragraph 200 - that a subordinate had requested and been approved for work-from-home. Standard 14.4 (Representation to Other Agencies) is implicated because Reich's sworn representation to a federal court is documentarily contradicted by an email produced by her own institution in the same federal litigation.

**Doc 69-7 pp. 311-312 (2 pp) - The Ferro-authored May 1, 2024 HR-interrogation summary of Peter Brake's Title IX concerns raised to HR and not routed to Title IX.** Two pages at the end of Doc. 69-7 are the two-page HR summary of the May 1, 2024 videotaped HR interrogation of Peter Brake, preserved by Liberty inside its own Motion for Summary Judgment evidentiary base. Under "Peter's Concerns," the HR-authored summary catalogs ten Title IX / Sexual Misconduct Policy allegations Brake raised to Liberty HR against sitting Title IX Coordinator Nathan Friesema - none

of which HR routed to Title IX intake. Load-bearing verbatim entries include: (a) "Nathan makes people uncomfortable in the office - had made jokes about sexual assault 'a busy summer'"; (b) "Nathan talks about his BBQ business called 'butt stuff BBQ' which is supposedly a sexual reference and laughs about it - sold t-shirts on etsy that say 'I love buttstuff'"; (c) "Liz said that she wants to leave her door open and feels uncomfortable"; (d) "Nathan has told the office about his trips to blue moon strip club"; (e) "According to Erika, Nathan has said 'She's not black enough'"; (f) "Cases are dismissed and not adjudicated because Nathan does not want the employee to come back because there is a good chance they will be found responsible"; (g) "Brought these issues up to Dr. Costin and was told his perceptions are not reality"; and (h) "Feels like Ralph Smiley is his boss because every decision goes through him." Ferro categorized Brake's May 1, 2024 concerns as "serious" (Ferro Deposition Doc. 69-6, PDF p. 125; transcript p. 125:22 - 126:2) but did not route them to Liberty's Title IX intake; they were kept inside HR and passed to outside counsel Lathrop GPM.

**Presidential-level "your perceptions are not reality" statement.** Ferro's May 1, 2024 HR summary quotes Peter Brake reporting that when he "brought these issues up to Dr. Costin" - Liberty University President Dondi E. Costin, a Defendant in this action - Costin told him "his perceptions are not reality." This is on the record five months before Brake's termination and is directly probative in Plaintiff's action because it establishes a Presidential-level institutional practice, documented in Liberty's own HR summary in Liberty's own MSJ evidence, of dismissing whistleblower Title IX concerns raised to the President as perceptual rather than factual. Costin's later sworn deposition (Costin Deposition Doc. 69-10, PDF pp. 26-27; transcript p. 25:24 - 26:4) confirms that Costin "did nothing" to investigate a separate fear-of-retaliation report from the same whistleblower. Together, the two records document that Liberty's Presidential-level response to whistleblower Title IX concerns was to dismiss rather than to investigate.

**Ralph Smiley - General Counsel routing of OEC Title IX decisions.** Brake's HR-reported statement quoted at paragraph 203(h) - "Feels like Ralph Smiley is his boss because every decision goes through him" - documents at the compliance-operator level that Liberty's Office of Equity and Compliance / Title IX Coordinator's independence was compromised by routing of decisions through Liberty's Office of Legal Affairs (Ralph Smiley). This is a 34 C.F.R. Section 106.45 concern - the "impartial" clause of the Title IX grievance process - and is directly probative in Plaintiff's action because the same institutional apparatus adjudicated Plaintiff's Title IX complaint against Defendant Wright.

**The three-part ban-from-campus and jurisdictional-insulation tactic - directly parallel to Liberty's handling of Plaintiff's own 26-month Title IX case.** Doc. 69-7 p. 312 concludes Ferro's May 1, 2024 HR summary with Peter Brake's HR-reported description of a three-part tactic operated by Title IX Coordinator Friesema to make Title IX cases go away without adjudication on the merits: (i) "supposedly quit because of the titleIX complaint 'because Nathan Freisma weaponized it'" - weaponize the Title IX process to induce the target to leave the institution; (ii) "Nathan said HR banned her from campus...she did not get a ban letter... Nathan banned her in an email??" - ban the target from campus by informal email rather than through any formal ban-letter process; and (iii) "Waited until [she] was not an employee to make a determination because at that point it was outside of their jurisdiction" - delay the substantive determination until the target is no longer a Liberty community member, then dismiss for lack of jurisdiction. The tactic is documented by Liberty's own HR office in Liberty's own MSJ evidence, and is directly probative in Plaintiff's action because Plaintiff's own Title IX case against Defendant Wright took twenty-six months from Plaintiff's initial May 14-15, 2024 reports (paragraph 46) to the July 17, 2026 Notice of Determination (paragraph 158), during which time Liberty imposed the August 16, 2024 remediation

hold, the November 13, 2024 FERPA-implicated employment termination, and the June 17, 2025 program-dismissal email - actions that in combination effected the same institutional-community-status termination that the Friesema tactic exploited for jurisdictional-insulation purposes.

The five newly-extracted Doc. 69 sub-exhibits catalogued in this Section R are separately admissible in this action under Federal Rule of Evidence 803(6) (records of a regularly conducted activity, as to the Reich June 20, 2024 memo and the Ferro May 1, 2024 summary), Federal Rule of Evidence 801(d)(2) (statements by a party-opponent, as to the Reich memo, the Padilla emails, and the HR summary), Federal Rule of Evidence 902(4) (self-authenticating certified copies of official records, as to all five sub-exhibits filed on the *Brake v. Liberty* federal docket), and, where relied on for the truth of Liberty's routine practice, Federal Rule of Evidence 406. Taken together with Section Q above, the Section R materials establish that Liberty's institutional-integrity failures - documented in the same period in which Plaintiff's own Title IX case was pending - reflect an institutional practice rather than isolated conduct, and that Plaintiff's twenty-six-month case timeline (paragraph 177), the November 13, 2024 FERPA-implicated employment termination (paragraphs 96-100), the June 17, 2025 program dismissal (paragraph 132), and the July 17, 2026 Notice of Determination reaching "not responsible" on findings that contradict Liberty's own records (paragraph 163) are of a piece with the Doc. 69 record documenting Liberty's institutional-practice ban-from-campus and jurisdictional-insulation tactic and Presidential-level dismissal of whistleblower Title IX concerns.

## S. Documentation-Integrity Contradiction: The July 17, 2026 Notice of Determination's Phone-Records Assertion Compared Against Liberty's Contemporaneous Registrar Production and Liberty's Own Motion to Quash Cellular-Carrier Subpoenas in *Woolfolk*

***v. Liberty University***

207A. The July 17, 2026 Notice of Determination in Case No. 2024046901 (paragraphs 150-157 above), at page 10, contains the following verbatim assertion: **"Despite representing that she had records to support her allegations, Complainant did not provide phone or any other records to support this (or any other) allegation."** The Determination further asserts, at page 10, that "Respondent, however, provided his mobile phone records to demonstrate that the allegation was untrue; Respondent's mobile phone records for May through August 2024 do not show any calls made to Complainant," and at page 10 that "Complainant's decision to not provide the information, without explanation, given the contrary evidence, and in these circumstances, supports the conclusion that she did not possess information that would support her allegations." Liberty offered those assertions as material bases for the "not responsible" finding as to Defendant Wright, and as an evidentiary deficit imputed to Plaintiff.

207B. The assertion cannot be reconciled with Liberty's own contemporaneous Registrar production. On March 11, 2025 - sixteen months before Liberty issued the Determination - Liberty Registrar staff (Becca Brooks) transmitted to Plaintiff a **563-record account phone log** in response to a March 2025 records request (the same log referenced at paragraphs 46-50, 66, 133, and 197 above). The 563-record log is Liberty's own Registrar-produced contemporaneous record of Plaintiff's phone-call interactions with Liberty personnel across Advising, Registrar, Counseling Remediation, and OEC-adjacent departments beginning in May 2024. Liberty was therefore in continuing possession of Plaintiff's phone-log record at the time it wrote the July 17, 2026 Determination, and had produced it to Plaintiff sixteen months earlier.

207C. The 563-record log also contains Liberty Advising's own contemporaneous written call-registration entries memorializing Plaintiff's May 14-15, 2024 reports of Defendant Wright's inappropriate conduct (paragraphs 47-50 above), the next-day dispatch of a complaint form to Plaintiff (paragraph 48), and the Liberty-authored pathologizing characterization of

Plaintiff's report as "ranting" (paragraph 49). The Determination's assertion that Plaintiff "did not provide phone or any other records" is therefore contradicted by Liberty's own Registrar-produced primary source in three distinct respects: the fact of the calls, the substance of the reports, and the contemporaneous Liberty-staff-authored notes of the intake.

207D. In the parallel federal action *Woolfolk v. Liberty University, Inc., et al.*, No. 6:25-cv-00059-NKM-CKM (W.D. Va.) - a Title-VII, Title IX, and Section 1981 action brought by former Liberty Office of Equity and Compliance Investigator Erika Woolfolk against Liberty University and OEC/Title IX leadership - Liberty University filed a **Motion to Quash Subpoenas** (Doc. 25) with a supporting memorandum of law (Doc. 26) on **March 10, 2026**, approximately four months before Liberty issued the July 17, 2026 Notice of Determination in Plaintiff's own case. The Motion sought to quash four subpoenas served in the *Woolfolk* action, three of which sought text-message and call-detail records from cellular carriers for members of Liberty's Office of Equity and Compliance / Title IX leadership for the **January 1, 2024 through June 30, 2024** window:

(a) Doc. 26-2 - subpoena to T-Mobile for text-message and call-detail records of Ashley Reich (Senior Vice President for University Compliance) with Diane Padilla, Steve Foster, and Nathan Friesema, January 1, 2024 through June 30, 2024;

(b) Doc. 26-3 - subpoena to T-Mobile for text-message and call-detail records of Diane Padilla (Interim Title IX Coordinator, Lathrop GPM) with Steve Foster and Ashley Reich, January 1, 2024 through June 30, 2024; and

(c) Doc. 26-4 - subpoena to AT&T for text-message and call-detail records of Nathan Friesema (Title IX Coordinator) with Diane Padilla, Steve Foster, and Ashley Reich, January 1, 2024 through June 30, 2024.

207E. Liberty's stated grounds for the Motion (Doc. 26, at PDF p. 7, Pageid# 146) included a blanket assertion of attorney-client privilege prophylactically claimed over all Reich /

Padilla / Friesema cellular text messages within the six-month window, on the theory that the three individuals "regularly communicated with in-house counsel and outside counsel regarding university matters."

207F. On **March 19, 2026** - nine days after filing the Motion to Quash - Liberty filed a **Notice Withdrawing Motion to Quash Subpoenas** (Doc. 27), stating that the Motion was withdrawn "**in light of reaching an agreement among counsel** for the parties with respect to the subpoenas at issue." The terms of that agreement **do not appear on the public docket**. The practical effect of the private off-docket agreement on the scope of records actually produced by T-Mobile and AT&T is therefore not visible to any third party reviewing the *Woolfolk* federal docket.

207G. Each of the three cellular-carrier subpoena packets filed on March 10, 2026 (Doc. 26-2, Doc. 26-3, and Doc. 26-4) contains, at the eleventh page of each exhibit, a **pre-drafted "Affidavit of No Record" template** available to the subpoenaed carrier. If executed by T-Mobile or AT&T after the March 19, 2026 withdrawal on the private off-docket agreement, the practical result would be **zero cellular records produced** - a de facto suppression outcome effected through retention-gap affidavits rather than through the protective-order machinery ordinarily reviewed by the court.

207H. The **January 1, 2024 through June 30, 2024** window that Liberty sought to seal in the *Woolfolk* action is the same six-month window in which Plaintiff made her contemporaneous May 14-15, 2024 reports of Defendant Wright's inappropriate sexualized conduct to Liberty Advising staff (paragraphs 46-50 above). Phone-carrier records for Reich, Padilla, and Friesema across that window would have documented the OEC/Title IX leadership communications during the same period in which Plaintiff's reports were routed - or not routed - through Liberty's internal Title IX channels, and would have been directly probative of the six-month delay between Plaintiff's May 14-15, 2024 reports and the November 11, 2024

mandated-reporter filing referenced at paragraphs 51 and 112.

207I. Read together with the Determination's phone-records assertion, the *Woolfolk* March 10-19, 2026 motion-to-quash sequence documents an institutional posture in which Liberty simultaneously:

(a) suppressed federal-court production of the phone-carrier records that would document its own OEC/Title IX leadership's communications during the operative period (Woolfolk Doc. 25 / Doc. 26 → Doc. 27 private off-docket agreement, with pre-drafted "Affidavit of No Record" templates);

(b) told Plaintiff, in Liberty's own written Determination, that she "did not provide phone or any other records" - while Liberty was itself already in possession of Plaintiff's 563-record Registrar-produced phone log; and

(c) placed Plaintiff in a position where the phone records that would corroborate her allegations were held in three separate Liberty-controlled locations - (i) Liberty's own Registrar (the 563-record log, already produced); (ii) the cellular carriers of Liberty's own OEC/Title IX / HR leadership (the records that were the subject of the *Woolfolk* subpoenas Liberty moved to quash); and (iii) Liberty's own institutional email and Teams-message systems - none of which the Determination acknowledged.

207J. On August 6, 2026, Plaintiff, through her document custodian, transmitted the foregoing documentation-integrity contradiction to the U.S. Department of Education Office for Civil Rights as a supplemental submission in OCR Case No. 11-26-2466. The August 6, 2026 OCR submission ("OCR Supplemental Submission - Evidence Preservation & Suppression Pattern") is a contemporaneous federal-oversight filing preserving the same contradiction pleaded here.

207K. The *Woolfolk* motion-to-quash sequence is admissible in this action under Federal Rule of Evidence 902(4) as self-authenticating certified copies of official records filed on the *Woolfolk* federal docket (Doc. 25, Doc. 26, Doc. 26-1 through Doc. 26-4, and Doc. 27), and under Federal Rule of Evidence 801(d)(2) as party-opponent statements of Liberty University concerning the phone-carrier records of the same OEC/Title IX leadership whose communications during the operative period bear on Liberty's response to Plaintiff's May 14-15, 2024 reports. The 563-record Registrar-produced phone log is admissible under Federal Rule of Evidence 803(6) (records of a regularly conducted activity) and Federal Rule of Evidence 803(1) (present-sense impression, as to the individual call-registration entries authored by Liberty Advising at the time of the calls).

207L. The Determination's phone-records assertion, the 563-record Registrar-produced phone log, and the *Woolfolk* motion-to-quash sequence together establish, on Liberty's own primary sources, that the July 17, 2026 Determination was issued on a factual record that Liberty's own contemporaneous Registrar production and Liberty's own contemporaneous federal-court filings directly contradict. That contradiction is separately probative of the deliberate-indifference element pleaded in Count II below, of the retaliatory-motivation element pleaded in Count I below, and of the good-faith-and-fair-dealing element pleaded in Count IV below.

## II. Plaintiff Has Suffered Immense Damages

Plaintiff has suffered severe emotional distress and psychological injury arising from the sequence of events described above, including the sudden bereavement of her sister during the operative period without appropriate accommodations, the sudden termination from her Western Mental Health Center employment (concurrent with her clinical internship and prospective post-program employment), and the sudden foreclosure of her degree pathway.

Plaintiff has suffered damage to her professional reputation and lost career opportunities in the field for which her graduate education prepared her.

Plaintiff has suffered economic damages, including the loss of the earned degree for which she paid tuition, the balance of federal loans Liberty certified on the basis of representations that were, on Liberty's own records, inaccurate, and the loss of income associated with her Western Mental Health Center employment (concurrent with her clinical internship and prospective post-program employment).

Plaintiff has suffered the loss of the professional identity associated with the CACREP-accredited clinical mental health counseling credential, which the earned Master of Arts degree would have supported.

Plaintiff has suffered the ongoing loss of access to state licensure pathways in Minnesota and elsewhere that require completion of a CACREP-accredited program.

Plaintiff has suffered the collateral loss of professional-network relationships built during the internship and post-program employment, which Liberty's FERPA disclosure and program dismissal foreclosed.

Plaintiff has suffered the direct expense of pursuing external oversight channels, including OCR, SCHEV, CFPB, Federal Student Aid, the Office of Inspector General, and multiple accreditors, to attempt to obtain redress that Liberty's internal process did not provide.

Plaintiff has suffered the direct expense of legal representation to prepare and file this Complaint.

Plaintiff has suffered continuing exposure to Liberty's NDA framework, which - under Liberty's own written articulation - treats unauthorized redistribution of the case file as retaliation or interference. Plaintiff's ability to communicate about her own case

with external oversight bodies, with future counsel, and with the public remains subject to Liberty's asserted restraint.

Plaintiff has suffered the consequences of Liberty's refusal to confer the degree she earned, paid for, and for which Liberty issued a receipt through the Registrar's Office. Plaintiff's academic transcript reflects the credit hours earned; Liberty's refusal to confer the degree is a repudiation of the contractual bargain Plaintiff performed.

Plaintiff continues to suffer emotional pain and anxiety, together with the stress of ongoing uncertainty regarding her degree, her career, her federal loan liability, and her ability to communicate with oversight bodies about her own case.

Plaintiff's damages continue to accrue.

## CAUSES OF ACTION

### COUNT I

### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. Section 1681 et seq. -- Retaliation

### (As to Defendant Liberty University, Inc.)

Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

Title IX of the Education Amendments of 1972 provides, in relevant part, that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

Liberty is an "educational program" under Title IX and is a recipient of federal funding.

Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination prohibited under Title IX. Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173 (2005).

At the pleading stage, a plaintiff sufficiently alleges a Title IX retaliation claim by alleging (1) that the recipient took an adverse action against her, and (2) because she engaged in protected activity under Title IX.

Plaintiff engaged in Title IX protected activity, including without limitation when:

(a) On May 14-15, 2024, Plaintiff reported Wright's inappropriate sexualized conduct in the COUC 693 classroom to her Liberty advising staff, as memorialized in Liberty's Registrar-produced 563-record account phone log;

(b) On July 23, 2024, Plaintiff reported unsafe site conditions at Project Turnabout to Director of Clinical Training Dr. April R. Crable, which report was acknowledged by Dr. Crable in writing the same day;

(c) On August 8, 2024, Plaintiff emailed Wright disclosing her sister's death, her hospice circumstances, HIPAA-related site barriers to submission of the final clinical assignments, and 680 hours of trauma exposure over the internship;

(d) On or about November 11, 2024, Plaintiff's Liberty advisor, acting as a mandated reporter, filed a report of Wright's conduct with the Office of Equal Rights and Title IX;

(e) On or about May 15, 2024 (initial) and on or about April 19, 2026 (supplemental), Plaintiff filed complaints with the Office for Civil Rights (Case

OCREMAIL00766493G and its successor);

(f) On June 24, 2026, Plaintiff filed a written compliance report with Liberty's Ethics and Compliance office concerning the NDA framework as an interference with the Title IX process; and

(g) Plaintiff participated in the Title IX formal complaint process filed on June 11, 2025 (Case No. 2024046901).

226. Liberty's retaliatory motivation against Plaintiff is demonstrated by the actions of Liberty faculty, staff, and administrators preceding and following Plaintiff's protected activity, including without limitation:

(a) On August 12, 2024 - four days after Plaintiff's August 8, 2024 protected disclosure to Wright, and approximately three months after Plaintiff's May 14-15, 2024 reports of Wright's own conduct - the Department Remediation Committee issued the Academic Misconduct Notice, itemizing site-related charges contradicted charge-by-charge by pre-existing Liberty-authored records;

(b) On August 16, 2024, Liberty placed an administrative remediation hold on Plaintiff's student account with a system default end-date of December 31, 2099, without notice, plan, meeting, or appeal rights;

(c) In or about early November 2024, Liberty disclosed Plaintiff's remediation-hold status - together with other personally identifiable information from Plaintiff's education record - to Western Mental Health Center, Plaintiff's employer during her clinical internship placement and her prospective post-program employer, resulting in the termination of Plaintiff's employment on November 13, 2024;

(d) On March 7, 2025, Liberty convened a Remediation Meeting at which the facilitators pathologized Plaintiff, declined to review the evidence supporting the underlying

Misconduct Notice, and refused to allow Plaintiff to read a prepared statement into the record;

(e) On June 17, 2025, Liberty issued the program-dismissal email through Registrar Julia Jimenez foreclosing Plaintiff's ability to pursue any degree within the School of Behavioral Sciences;

(f) From March 11, 2026 onward, Liberty imposed the NDA framework as a condition of evidence access in the Title IX process; and

(g) On July 17, 2026, Liberty issued a Notice of Determination that reaffirmed the NDA framework, characterized Plaintiff's non-participation as an exercise of "right," and reached factual findings that collided with Liberty's own contemporaneous records.

Plaintiff suffered adverse actions by Liberty within the meaning of Title IX, including without limitation the August 12, 2024 Academic Misconduct Notice; the August 16, 2024 remediation hold; the November 13, 2024 FERPA-implicated disclosure and consequent employment termination; the June 17, 2025 program dismissal; the March-April 2026 NDA-gated evidence access; the May 27, 2026 hearing held under NDA restraint; and the July 17, 2026 Notice of Determination.

Each of those adverse actions occurred after, and would not have occurred but for, Plaintiff's protected activity.

Liberty's retaliatory conduct was intentional, or at minimum was undertaken with deliberate indifference to a known risk of retaliation, and was carried out by persons with authority to take corrective action on behalf of Liberty.

Liberty's conduct violated Section 6.8 of its own Sexual Misconduct Policy, which defines retaliation to include "adverse changes in employment status or opportunities" and "acts or comments that are intended to discourage a person from

engaging in activity protected under this Policy or that would discourage a reasonable person from engaging in activity protected under this Policy."

As a direct and proximate result of Liberty's retaliatory conduct, Plaintiff has sustained tremendous damages in an amount to be determined at trial, including without limitation emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

As a result of the foregoing, Plaintiff is entitled to a judgment against Defendant Liberty University, Inc. awarding Plaintiff damages in an amount to be determined at trial, together with prejudgment interest, attorneys' fees, expenses, costs, and disbursements, and injunctive relief restraining continued violation of Title IX, including but not limited to (i) an order requiring Liberty to vacate the July 17, 2026 Notice of Determination in Case No. 2024046901; (ii) an order requiring Liberty to vacate the August 16, 2024 remediation hold and to remove the associated hold entries from Plaintiff's academic record; (iii) an order requiring Liberty to release the earned degree; (iv) an order restraining Liberty from enforcing the NDA framework against Plaintiff or her advisors; and (v) such further relief as the Court deems just.

Plaintiff also seeks an order requiring Liberty to make Plaintiff whole for the federal student-loan liability Liberty certified during periods when, on Liberty's own records, Plaintiff was blocked by the remediation hold or was in less-than-full-time enrollment.

Plaintiff further seeks an order enjoining Defendants from imposing upon Plaintiff any bar to communicating with external oversight bodies about her own case.

**COUNT II**

**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. Section 1681 et seq.**

**-- Deliberate Indifference / Denial of Educational Access**

**(As to Defendant Liberty University, Inc.)**

Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

An educational institution that receives federal financial assistance may be liable under Title IX where the institution acts with deliberate indifference to known acts of sex-based harassment or discrimination that are so severe, pervasive, and objectively offensive that they deprive the victim of access to educational opportunities or benefits. See Davis v. Monroe County Bd. of Educ., 526 U.S. 629 (1999); Doe v. Fairfax Cty. Sch. Bd., 1 F.4th 257 (4th Cir. 2021).

Liberty had actual notice of Plaintiff's May 14-15, 2024 reports of Wright's inappropriate sexualized conduct in the COUC 693 classroom, as memorialized in Liberty's own Registrar-produced 563-record account phone log.

Liberty had actual notice of Plaintiff's July 23, 2024 report of unsafe site conditions at Project Turnabout, as acknowledged by Director of Clinical Training Dr. April R. Crable in her contemporaneous written email.

Liberty had actual notice through its Title IX intake staff of the pattern of sexual-harassment allegations against Wright, including the mandated-reporter filing of on or about November 11, 2024.

Liberty had actual notice through the Recording 38 and Recording 42 intake meetings of Plaintiff's specific concerns about the Title IX process and the substance of the underlying allegations.

Notwithstanding actual notice, Liberty's response to Plaintiff's reports was clearly unreasonable in light of the known circumstances, including without limitation:

(a) failure to open a formal Title IX intake for approximately six months following the initial May 14-15, 2024 reports;

(b) failure to provide supportive measures under 34 C.F.R. Section 106.44(a);

(c) failure to conduct an initial assessment;

(d) issuance of the August 12, 2024 Academic Misconduct Notice on charges contradicted by pre-existing Liberty-authored records;

(e) imposition of the NDA framework as a condition of evidence access, notwithstanding 34 C.F.R. Section 106.45(b)(5)(vi);

(f) issuance of the July 17, 2026 Notice of Determination that reached factual findings colliding with Liberty's own contemporaneous records;

(g) narrowing of the operative definitions of "retaliation," "interference," and "discrimination" by trained Title IX intake staff to Liberty-policy-specific constructions that excluded conduct that would qualify under the federal regulation; and

(h) invocation of FERPA as a shield against state and federal oversight inquiries into the process.

Liberty's response was carried out by persons with authority to take corrective action on behalf of Liberty, including Defendants Costin, Wright, Crable, Camden, and Vaughan, and by other named and unnamed Liberty faculty, staff, and administrators.

Liberty's deliberate indifference deprived Plaintiff of access to the educational opportunities and benefits of Liberty's CACREP-accredited Clinical Mental Health

Counseling program, including the earned degree, the required 600 clinical hours in a safe placement, the required faculty group supervision by a supervisor who had not been the subject of Plaintiff's reports, and the state-licensure pathway that completion of the accredited program would have supported.

Liberty's deliberate indifference proximately caused Plaintiff's severe emotional distress, professional-reputation damage, loss of career opportunities, and economic loss described in Section II above.

Liberty's deliberate indifference violated 20 U.S.C. Section 1681 and its implementing regulations at 34 C.F.R. Part 106.

Liberty's deliberate indifference also violated Section 6.8 of Liberty's own Sexual Misconduct Policy.

As a direct and proximate result of Liberty's deliberate indifference, Plaintiff has sustained tremendous damages in an amount to be determined at trial, including without limitation emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

Plaintiff is entitled to a judgment against Defendant Liberty University, Inc. awarding Plaintiff damages in an amount to be determined at trial, together with prejudgment interest, attorneys' fees, expenses, costs, and disbursements, and injunctive relief restraining continued violation of Title IX.

Plaintiff is entitled to the same injunctive relief specified in paragraphs 226 through 216 above.

**<u>COUNT III</u>**

**Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. Section 794, and the Americans with Disabilities Act, 42 U.S.C. Section 12181 et seq. – Failure to Accommodate**

**(As to Defendant Liberty University, Inc.)**

Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

Section 504 of the Rehabilitation Act of 1973 provides that "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

Title III of the Americans with Disabilities Act extends parallel protections and provides that a person with a disability shall not be discriminated against in the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."

Liberty is a recipient of federal financial assistance and is a place of public accommodation for purposes of Section 504 and the ADA.

Plaintiff, during the operative period, was experiencing a documented bereavement crisis following the death of her sister, was working on a 680-hour clinical placement carrying substantial trauma exposure, and was facing HIPAA-related site barriers that limited her ability to complete the final assignments on the schedule Wright refused to modify.

Plaintiff was otherwise qualified to participate in the CACREP-accredited Clinical Mental Health Counseling program. Liberty's Registrar had confirmed Plaintiff's earned credit hours through the practicum and internship placements.

Reasonable modifications were available to Liberty and were necessary to afford Plaintiff equal access to the educational program, including without limitation a bereavement extension under Wright's own "highly exceptional and emergent situations" standard; a temporary suspension of the assignment schedule pending resolution of the site HIPAA barriers; a transfer of the clinical placement to a safe site; and coordination with a Liberty disability-services professional.

Liberty granted none of the reasonable modifications identified in paragraph 247.

Liberty's failure to provide reasonable accommodations was itself a proximate cause of the assignment-completion difficulties that Liberty then used as the predicate for the August 12, 2024 Academic Misconduct Notice and for the August 16, 2024 remediation hold.

Liberty's failure violated Section 504 of the Rehabilitation Act, Title III of the Americans with Disabilities Act, and Liberty's own Nondiscrimination and Equal Opportunity Policy.

## COUNT IV

## Breach of Contract -- Virginia Common Law

## (As to Defendant Liberty University, Inc.)

Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

Under Virginia common law, an enrolled student and her institution of higher education enter into a contract governed by the institution's written policies, the terms of the student handbook, the terms of any executed agreement (such as the Off-Site Fieldwork Contract), and the institution's contemporaneous acceptance of the student's

tuition payments in exchange for progress toward a degree.

Plaintiff paid tuition and fees to Liberty in consideration of Liberty's promise to provide the educational services, credit hours, and, upon successful completion, the Master of Arts degree in Clinical Mental Health Counseling.

Liberty accepted Plaintiff's tuition and fees. Liberty issued a receipt through the Registrar's Office. Liberty's Registrar's Office recorded and confirmed the credit hours associated with Plaintiff's practicum and internship placements as they were earned. The earned credit hours appear on Plaintiff's official Liberty academic transcript.

Plaintiff satisfied the academic requirements of the CACREP-accredited Clinical Mental Health Counseling program. Plaintiff completed the required coursework. Plaintiff completed the required 100-hour supervised practicum. Plaintiff completed the required 600-hour supervised internship at an off-site fieldwork location approved by Liberty and supervised by a Liberty-approved site supervisor (Ms. Runia) whose signed evaluations rated Plaintiff at high performance levels.

Notwithstanding Plaintiff's performance, Liberty refused to confer the earned degree. Liberty imposed the August 16, 2024 remediation hold without notice, plan, meeting, or appeal rights. Liberty issued the June 17, 2025 program-dismissal email through Registrar Julia Jimenez foreclosing Plaintiff's ability to pursue any degree within the School of Behavioral Sciences. Liberty conducted the March 7, 2025 Remediation Meeting without review of the underlying evidence.

Liberty's refusal to confer the earned degree was carried out at the direction of the very department Plaintiff had reported - the Department of Counselor Education and Family Studies, School of Behavioral Sciences, in which Wright is a faculty member.

Liberty's imposition of adverse educational actions - the Academic Misconduct Notice, the remediation hold, the program dismissal, the denial of accommodations, the NDA-gated evidence access, the hearing held without evidence access, the Notice of Determination without evidence review, and the routing of the appeal to the Respondent-adjacent office - violated the terms of Liberty's own written policies, including without limitation:

(a) Liberty's Sexual Misconduct Policy (Section 6.8 - Retaliation and Interference; Section 11.7.5 through 11.7.8 - Grievance Process; Section 12 - Prompt and Equitable Process);

(b) Liberty's Nondiscrimination and Equal Opportunity Policy;

(c) Liberty's Student Handbook;

(d) The February 21, 2024 signed Off-Site Fieldwork Contract; and

(e) Liberty's written representations concerning federal-aid certification, enrollment status, and academic-record integrity.

Liberty's conduct also breached the implied covenant of good faith and fair dealing that attaches to every Virginia contract.

As a direct and proximate result of Liberty's breach, Plaintiff has sustained damages in an amount to be determined at trial, including without limitation the loss of the earned degree, the loss of the tuition and fees paid for a degree not conferred, the balance of federal loans Liberty certified on the basis of representations that were, on Liberty's own records, inaccurate, and the consequential damages described in Section II above.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiff prays for the following relief:

(i) On the first count of violation of Title IX of the Education Amendments of 1972 (retaliation), a judgment against Defendant Liberty University, Inc.:

a. damages in an amount to be determined at trial, including without limitation damages to physical well-being, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements; and

b. injunctive relief restraining continued violation of Title IX, including but not limited to (i) an order requiring Liberty to vacate the July 17, 2026 Notice of Determination in Case No. 2024046901; (ii) an order requiring Liberty to vacate the August 16, 2024 remediation hold and to remove the associated hold entries from Plaintiff's academic record; (iii) an order requiring Liberty to confer the earned Master of Arts degree in Clinical Mental Health Counseling; (iv) an order restraining Liberty from enforcing the NDA framework against Plaintiff or her advisors; (v) an order restraining Liberty from imposing upon Plaintiff any bar to communicating with external oversight bodies about her own case; and (vi) such further relief as the Court deems just;

(ii) On the second count of violation of Title IX of the Education Amendments of 1972 (deliberate indifference / denial of educational access), a judgment against Defendant Liberty University, Inc.:

a. damages in an amount to be determined at trial, including without limitation damages for emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements; and

b. the same injunctive relief specified in subsection (i)(b) above;

(iii) On the third count of violation of Section 504 of the Rehabilitation Act and the Americans with Disabilities Act (failure to accommodate), a judgment against Defendant Liberty University, Inc.:

a. damages in an amount to be determined at trial, including without limitation damages for lost educational and career opportunities, past and future economic injuries, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements; and

b. injunctive relief requiring Liberty to implement the reasonable modifications identified in paragraph 247 above, to the extent Plaintiff continues to require such modifications, and such further relief as the Court deems just;

(iv) On the fourth count of Breach of Contract (Virginia common law), a judgment against Defendant Liberty University, Inc.:

a. damages in an amount to be determined at trial, including without limitation the loss of the earned degree, the loss of the tuition and fees paid for a degree not conferred, the balance of federal loans Liberty certified on the basis of representations that were, on Liberty's own records, inaccurate, and consequential damages, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements; and

b. specific performance requiring Liberty to (i) confer the earned Master of Arts degree in Clinical Mental Health Counseling, (ii) release Plaintiff's complete and unrestricted academic transcript reflecting the earned degree, and (iii) issue any certifications and letters of recommendation ordinarily produced by the program for a graduate in good standing.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury of all triable issues in the present matter.

Dated: August 13, 2026

Respectfully submitted,

**MARY K. WELSH**

By: /s/ Mary K. Welsh

[Attorney of Record TBD]


[FIRM NAME] Mary K. Welsh

[ADDRESS] 204 N. Jackson Ave

[CITY, STATE, ZIP] ~~[illegible]~~ springfield MN 56087

Tel: [PHONE] 206-953-7060

[EMAIL] marywelsh777@yahoo.com

*Attorneys for Plaintiff Mary K. Welsh*


---

## VERIFICATION

I, Mary K. Welsh, hereby declare, subject to the penalties of perjury pursuant to 28 U.S.C. Section 1746:

1. I am the Plaintiff in the above-entitled action.

2. I have read the annexed Complaint, know the contents thereof, and the same are true to my knowledge, except as to matters alleged upon information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury, pursuant to 28 U.S.C. Section 1746, that the foregoing is true and correct.

Dated: August 13, 2026

08/13/2026

Mary K. Welsh
204 N Jackson Ave
Springfield, MN 56087
marywelsh777@yahoo.com
(206) 953-7060